[Crim. No. 1097. Third Appellate District.—December 30, 1929.]

THE PEOPLE, Respondent, v. HAROLD H. BRAGDON, Appellant.

L. C. Smith, Arthur M. Dean and John S. Reid for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendant was convicted of the crime of burning two insured barns on the Bragdon ranch in

Trinity County with the intent to defraud the insurer. This appeal is from the judgment of conviction and the order denying a new trial.

The barns are referred to as the "upper barn" and the "lower barn," each of which was insured against loss by fire in the sum of $1,000. The prosecution did not contend that the defendant personally set fire to the barns, but that he hired Lloyd Clayton Smith to do so. Smith was residing on the ranch with his family at the time of the fire, but the defendant was outside the county. The barns were burned between 3 and 4 o'clock in the morning of February 27, 1929.

Smith testified that he was hired by the defendant to burn the barns in the latter part of January, 1929, or the early part of February. He further testified: "I was working in the mine there. . . . Bragdon, he comes out with a mining man by the name of Kaufman, I believe, and Charlie Heath. They was looking the mine over, and I went around with him a little while. Finally I went back to work . . . and pretty soon Bragdon came down to where I was working. We talked around a little bit about the mine. He wanted to know how I was getting along, how much I was taking. I wasn't making much, maybe a dollar or so a day. I don't know everything that he said. He asked me if I wanted to make a proposition. 'Well,' I said, 'I don't know. I might.' I happened to think of a conversation I had with another party before that about the fires, so I just thought I would try it on him. I asked him what he wanted me to do, burn the barns? . . . He said, 'How much do you want?' I said, 'Three or four hundred dollars.' He said that was too much, that he wouldn't pay it. . . . He said he thought the insurance was taken off, or part was off, . . . or outlawed, or something to that effect. . . . He finally offered me $200 and pay my grocery bill. . . . Then he . . . said he would give me $250 cash if I did the job, and while we were talking we fixed up kind of a code like, so he would let me know to do the job, but he wanted to wait till he got the upper barn insured. . . . When he got it fixed up, he would let me know. If he sent word for me to go ahead and fix the upstairs, that was to set the barn off across from the cottage; if he told me to go ahead with the drift, that was to touch the upper barn off."

February 20th the defendant mailed a registered letter at Woodland directed to "Mr. L. C. Smith, c/o Bragdon Ranch, Lewiston, Calif." The letter was delivered to Smith February 24th. Smith testified that the envelope contained two letters, one signed by the defendant and the other unsigned. Both were shown to be in the defendant's handwriting and were introduced in evidence. The unsigned letter reads as follows:

"Mr. L. C. Smith.

"Dear Sir:

"That has been taking off of everything but upper barn and it will take me time to get fixed up again so get it at once. That is the one towards Rush Creek by wagon shed and not the one you wanted to get. There is $1,000 on it and $100 to you and we will get the other later. My men will be up in the next day or two so get this fixed at once and don't say a thing to Charley. If they don't take it over I am going to start it up myself as soon as we get this money and you can have a job. It will only take 10 or 12 days to get it. . . . We can make a good job of things later but there is a lot of red tape to go through and it will take a long time to get it fixed and I want to put on more where it will pay both of us. I will send another letter giving you orders to move so you can show Paulsen what the letter was you rec. so he will know what I wrote you about and wont suspect anything wrong so be sure and show it to him and Charley. Burn this up as soon as you get it."

On February 23 the defendant wired Smith:

"Party coming Monday have Mead tunnel cleaned and go ahead with drift."

Smith further testified that about February 25th the defendant arrived at the Bragdon ranch; that the witness there said to the defendant, "I didn't get your letter until this morning," and that the defendant replied that "he had the other barn fixed up now, to go ahead and do the whole job; said he would give me $300 and he only had two or three days left now on the insurance on the barns, and I only had two or three days to do the job in." Smith explained his reason for not burning the letter as follows: "After I done the job, I just got to thinking that I might need that to force payment out of him." He testified that

he put the unsigned letter "in a tobacco can and hid it out back of the woodshed." After he had admitted to the sheriff of the county that he had burned the barns he also stated that he had hidden the letter in the manner stated. The sheriff thereupon went to the Bragdon ranch and found the letter at the place indicated.

█ The court excused a juror for cause on the ground that one of the attorneys for defendant was attorney for the juror in a pending civil action. Appellant contends that this was prejudicial error. There is no merit in the contention. (*People* v. *Malone,* 68 Cal. App. 615, 617 [229 Pac. 1000].)

█ The defendant's mother was the owner of·the Bragdon ranch. In his opening statement to the jury the district attorney stated that he would prove that at the time of the fire taxes on the ranch were delinquent to the amount of $5,000 or $6,000; that "in July, 1928, there had been a hotel building on the premises, but that burned and that there was considerable insurance on the hotel building . . . and that the defendant . . . received a substantial portion thereof." A map of the premises, on which appeared a black space to indicate the location of the hotel, was admitted in evidence. A statement, made by the defendant, was introduced in evidence, in which he stated that he received the sum of $1500 out of the insurance money paid on account of the loss of the hotel. Appellant contends that such statement by the district attorney was prejudicial misconduct and that the admission of the map and defendant's statement constituted reversible error, on the ground that the natural effect thereof was to cause the jury "to believe that the defendant not only set the fires involved in this case, but had set another fire for the purpose of collecting the insurance." There is nothing in the statement of the district attorney or in the evidence referred to which indicates that the fire of July, 1928, was of incendiary origin. It appears rather that the district attorney was attempting to prove that the defendant had a motive for burning the barns, on the theory that, having received part of the insurance money when the hotel was burned, he hoped to receive a part of the insurance money on the burning of the barns.

It is true, of course, that Smith's testimony alone, he being an accomplice, is insufficient to warrant a conviction, but the unsigned letter, proved by independent testimony to be in the defendant's handwriting, strongly tends to connect him with the commission of the crime and amply corroborates Smith's testimony. The telegram mentioned also tends to corroborate such testimony.

Counsel for defendant cross-examined Smith in part as follows: "Q. Then you, out of a clear sky, in response to a statement of the defendant in this case, said right without any previous conversation, 'What do you want me to do? Burn your barns down?' Is that what happened? A. I had another conversation with another party before that." On redirect examination, the following occurred: "Q. . . . You said . . . when he asked you to make a proposition, that you said, 'Do you want me to burn your barns?' . . . Why did you say that? A. Well, just conversation with Harley Mead one time up at my place. Q. What was that? Mr. Smith: Objected to as hearsay, as to defendant, incompetent, irrelevant and immaterial. The Court: Overruled. A. Talking about the other fire, and Mead talking about it, he said, 'It is a wonder that Bragdon has not tried to make a proposition to you to burn his barns down, by now.' I said 'Maybe he will.' That's where I got the idea, and when he talked about a proposition it flashed through my mind that's what he wanted to talk about, so I said it." On recross-examination the witness was examined as follows: "Q. Now then, you gave certain portions of testimony, or conversation that you had with Harley Mead. Will you give the rest of that conversation? A. He was staying there. He was boarding at my place at the time, we were talking about the fire, and he said, 'People figured that he had the big house burned down.' He said the barn caught fire across the way and somebody put it out, and he came out there and was kind of mad that they didn't let the barns go at the same time that the big house did. Q. Who said that? Harley Mead? A. Harley Mead, yes. Q. What did you say? A. I don't remember, I didn't know anything about it." Harley Mead was called as a witness by the prosecution and examined as follows: "Q. Do you remember having a talk with him (Smith) in regards to the sentiment of certain persons or people in Lewiston in

regard to the burning of the hotel? Mr. Smith: We object to that as incompetent, irrelevant, immaterial and hearsay. . . . The Court: Overruled. . . . A. I have a faint recollection of speaking to him something about some people made the remark that they thought that he either set it himself or had someone set it."

No attempt is made by the respondent to justify the overruling of the aforesaid objections of the defendant, and it does not appear upon what theory the rulings can be upheld. At the trial the district attorney said, in relation to the testimony offered: "It is not hearsay for the reason that the conspiracy has not been concluded until the insurance money has been paid." The answer to this argument is that there is not the slightest evidence of the existence of a conspiracy at the time to which the testimony relates, Smith's conversation with Mead having taken place prior to the time at which the defendant first broached the subject of burning the barns to Smith, according to the uncontradicted evidence of the prosecution. It is to be observed, however, that the most damaging part of the objectionable evidence was elicited by counsel for the defendant in the cross-examination of Smith and that Mead's testimony is but a milder statement of what was brought out on such cross-examination. A witness was permitted to testify, over the defendant's objection, that in a conversation at which the defendant was not present, the defendant's mother "stated there was around $5,000 in taxes on the place." This evidence was clearly hearsay and inadmissible, but the same fact was clearly proved by other testimony which was not objectionable. The other errors in the admission and rejection of evidence are of minor importance and need not be specifically discussed.

While under other circumstances the errors referred to might require a reversal, it cannot be said in this case that they have resulted in a miscarriage of justice. The defendant neglected to become a witness, and while this fact cannot in any manner affirmatively prejudice his case (Pen. Code, sec. 1323), his failure to testify leaves the most damaging evidence given against him wholly uncontradicted. Not only does Smith's testimony in relation to the conspiracy and the agreement as to a "code" for secret communications from the defendant stand uncontradicted, but the

independent testimony to the effect that the defendant wrote the unsigned letter and sent the "code" telegram is likewise uncontradicted and the statements therein are unexplained. Under such circumstances only a most credulous jury would return a verdict of not guilty.

■ Complaint is made of intemperate language used by the district attorney in his argument to the jury, made in reply to statements of counsel for the defendant. The transcript does not contain such statements, as required by rule II, section 7, of the rules of the Supreme Court and District Courts of Appeal, and in the absence thereof this court is left in the dark as to the provocation, if any, which induced the district attorney to use the language of which complaint is made. The language so used is not of such character as to constitute prejudicial misconduct if the provocation was great.

The judgment and the order are affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.