[Crim. No. 4686.   Second Dist., Div. Two.   Nov. 20, 1951.]

THE PEOPLE, Respondent, v. JACOB SELTZER, Appellant.

Jerome Weber and Jack Altman for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

McCOMB, J.—From a judgment of guilty, after trial before a jury, of arson and violation of section 450a of the Penal Code,* defendant appeals.   There is also an appeal from the order denying his motion for a new trial.

Viewing the evidence in the light most favorable to the People (respondent) the essential facts are these:

On March 3, 1950, defendant was the owner of the Great

*Section 450a of the Penal Code reads:  ''Any person who willfully and with intent to injure or defraud the insurer sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any goods, wares, merchandise or other chattels or personal property of any kind, whether the property of himself or of another, which shall at the time be insured by any person or corporation against loss or damage by fire, shall upon conviction thereof, be sentenced to the penitentiary for not less than one nor more than five years.''

Avalon Market in Los Angeles. At the time he acquired it insurance was transferred from another store which he had operated. This insurance expired on May 5, 1950. On this date defendant secured from the Northwestern National Insurance Company two insurance policies, one of which insured the equipment in the store for $2,000, the other insured the stock for $7,500. On October 26, 1950, defendant took out additional insurance in the amount of $2,500 on the stock and $4,500 on the furniture and fixtures with the Buffalo Insurance Company. On November 30, 1950, the policy on the furniture and fixtures with the latter company was increased by $1,000, thus making the total of the insurance on the furniture and fixtures $7,500 and on the stock $10,000.

On December 21, 1950 Leander Joseph Tenette, an employee of defendant, arrived for work at the store. In the afternoon defendant told him he was going to have dinner with his son and wanted to close the store on time, which was 7 p.m.; he also told Mr. Tenette since he lived in the direction he was going he would give him a ride home. Only once before had defendant driven Mr. Tenette home. Shortly before 7 o'clock Mr. Tenette took the money from the cash register, put it into separate paper sacks according to its denomination, and gave the sacks to defendant who walked with it in the direction of the safe which was in the rear of the store.

Defendant was out of Mr. Tenette's sight about a minute. Defendant then went into the stockroom at the rear of the store; came out of the stockroom and went to the light switches which were located in the rear of the store below and between two mezzanine balconies; turned out some of the lights and as he left the switch he noticed that some of the lights were still on. He then asked Mr. Tenette to help him turn them off and Tenette joined him at the switches and turned off all but one light, which it was customary to leave on all night.

Defendant then went to the burglar alarm switch, which was recessed in the front end of the meat counter. This was turned on and it rang, which indicated that not all of the burglar alarm traps had been set. Mr. Tenette looked over the traps and found two of them which were not near the check stand. He set them and told defendant to try it again and heard no further ringing of the alarm.

Defendant and Mr. Tenette then proceeded to the front door; when they got there defendant however without saying anything turned, went back into the store and in about 30 seconds returned to the door with a paper sack in his hand

which Mr. Tenette had last seen on the check stand of the store. Defendant locked the store; they got into his car about 7:04 p.m.; he then drove Mr. Tenette to the corner of 46th and Avalon. About 7:13 p.m. a fire broke out at the Great Avalon Market. When the firemen arrived there were flames at the approximate center rear wall of the market in the vicinity of the light switch. One of the firemen, about two minutes after he arrived, found in the storeroom of the building, a small pile of burning embers.

An expert for the Arson Bureau testified the main fire in his opinion had its origin in some cardboard containers beneath the light switch, and though it might have been caused by defective electrical connections, and though he could not actually determine what had caused the fire, it was his opinion that it had been caused by a flame being applied to combustibles by human hands. He also testified his examination of the second fire led him to believe it was the result of a flame applied to combustible cardboard containers by human hands. An examination of the burglar alarm showed the switch was open.

At about 10:40 p.m. on the night of the fire defendant and his wife arrived at the store. He asked Mr. Tobey, a coowner of the building in which the store was located, what had happened to which Mr. Tobey responded ''Can't you see?''

Defendant stated upon questioning by an investigator that he was the sole owner of the grocery department and he had paid $7,500 as a total consideration for the store including fixtures. He also told of the increase in insurance which he had made, stating that he grossed around $6,000 a month and took $400 to $450 monthly from the business. The fireman then asked defendant if he would like to walk into the store and see where the fire had occurred to which he replied that he would.

Defendant led the way into the store walking down the aisle in front of the meat department; he proceeded to a spot directly opposite the second fire and looked down at the floor, which had been cleaned of any evidence of fire except a bit of char on the wall. They asked what he was stopping for and he said, ''I don't know; I am just stopping.'' He was asked what he was looking at and he said, ''I don't know; I am just looking.''

Defendant was further interrogated as to his income and his income tax return, and finally he said, ''Gentlemen, if you want any other information you can talk to my accountant

Efron." After consultation the accounts disclosed there were discrepancies between actual figures and the statements made to the firemen by defendant. Also defendant had stated to the investigators that he had closed the burglar alarm switch before leaving the store on the night of the fire.

■ *Question: Was there substantial evidence to sustain the verdict of guilty and the judgment predicated thereon?*

*No.* While there is some competent evidence in the record which would with more tangible proof warrant a conviction, a reading of the record discloses no fact or combination of facts which would justify a finding that defendant caused in any manner either or both of the fires which took place in his store. Therefore the verdict and judgment are predicated upon mere suspicion and conjecture. The record is devoid of substantial evidence to sustain the judgment.

Reversed.

Moore, P. J., concurred.

A petition for a rehearing was denied November 28, 1951, and respondent's petition for a hearing by the Supreme Court was denied December 18, 1951. Shenk, J., and Edmonds, J., voted for a hearing.