[Crim. No. 1556. Fourth Dist. Sept. 29, 1960.]

THE PEOPLE, Respondent, v. MARVIN JAMES MILLER, Appellant.

Theodore G. Krumm, C. A. Broderick and Harold J. Ackerman for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

COUGHLIN, J.—The defendant was charged with, tried by a jury for, and convicted of the offense of arson, a violation of section 448a of the Penal Code. His motion for a new trial was denied. Judgment of imprisonment in the state prison followed. From the order denying this motion and from the judgment of imprisonment the defendant appeals, contending that the evidence is insufficient to support the verdict of the jury and that the trial court committed errors which deprived him of a fair trial.

## SUFFICIENCY OF THE EVIDENCE

"The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' " (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Massey,* 151 Cal.App.2d 623, 650 [312 P.2d 365]; *People* v. *Mazza,* 135 Cal.App.2d 587, 596 [287 P.2d 798].)

Counsel for defendant acknowledge the limitations thus imposed upon the appellate court in considering their conten-

tion that the evidence in the case at bar is insufficient to sustain the verdict; however, they contend that the evidence relied upon for a conviction in this case is not of that substantial nature required by law. (*People* v. *Schafer*, 198 Cal. 717, 721 [247 P. 576]; *People* v. *McClennegen*, 195 Cal. 445, 449-450 [234 P. 91]; *People* v. *Wilkins*, 141 Cal.App.2d 557, 560 [297 P.2d 42].) ▇ On the other hand, in presenting their contention they have succumbed to the temptation to argue the weight of the evidence and the credibility of the witnesses. A consideration of these factors is without the scope of appellate review. (*Estate of Teel*, 25 Cal.2d 520, 526 [154 P.2d 384]; *Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868]; *People* v. *Treggs*, 171 Cal.App.2d 537, 545 [341 P.2d 342]; *People* v. *Mazza, supra*, 135 Cal.App.2d 587, 596; *People* v. *Maxey*, 134 Cal.App.2d 611, 618 [286 P.2d 840].)

▇ On November 15, 1958, a fire of incendiary origin caused substantial damage to the buildings, equipment and stock of the Terri Lee Doll Manufacturing Plant in Apple Valley, California. Evidence of seven different fires, at widely separated places within the premises, and the use of some kind of accelerant to produce them supported the conclusion that they had been set. There is no contention that the evidence is not sufficient to support the implied finding of the jury that the offense of arson had been committed. Rather, the contention is directed to the proposition that there is no substantial evidence to prove that the defendant was the culprit.

For two years before the fire the defendant had known Violet Gradwohl, who was the president and principal stockholder of six corporations, generally referred to as the Terri Lee Enterprises, through which the doll factory was owned and operated. During that time she sought his advice as a financial consultant; considered employing him as general manager; had him assist the bookkeeper; counselled with him respecting the acquisition of a building in Nevada; discussed financing problems with him; borrowed money from him; obtained his analysis of the corporation's books; and had him audit one of the factory's accounts. On the day before the fire, Mrs. Gradwohl paid the defendant $1,000 by way of a cashier's check, which she testified was given to him for accounting services. The defendant became quite active in the Terri Lee Enterprises; at one time offered to buy into them for $150,000, but later withdrew the offer; on one occasion loaned Mrs. Gradwohl $2,000; on several occasions cashed checks for her; analyzed the company's books and told her that she had lost

$100,000 by embezzlement; urged her to obtain an audit; accompanied her to the office of the Small Business Administration from which one of the corporations had made a loan, where he indicated his interest in trying to help Mrs. Gradwohl with her financial problems and expressed a hope that he might purchase an interest in the business; and came to the plant about twice a week during the months of September to November of 1958.

The financial affairs of the "Terri Lee" corporations at the time of the fire were in a serious condition. Miller appeared to be familiar with the situation and testified that the enterprise was about $1,000,000 in debt. The loan from the Small Business Administration was delinquent, with a balance of approximately $230,000. One of the corporations owed $20,000 in wages. The production manager had not been paid any salary for 10 months, and the sum of $5,400 was due him. A bank was undertaking foreclosure proceedings to collect $4,500.

At the time of the fire the stock in the doll plant was insured for $211,000. Two days previously Mrs. Gradwohl had contacted her insurance agent and asked to have this insurance increased to $240,000. She testified that this request grew out of a recent inventory check which showed that she was underinsured.

On the morning of the fire, i.e., November 15, 1958, at the plant, a fireman observed flames coming out of a 5-gallon can marked "Wizard"; after the flames were extinguished, the can had an odor of a petroleum product; another fireman saw a round 5-gallon Franklin Floor Cleaner can on the floor in an area where there was an oil-type substance on the floor which had an odor of a petroleum product. Previously on this morning, at about 2 a.m., a man identified as the defendant, appeared at a Richfield Service Station in Victorville; stated that a friend of his had run out of gasoline; and asked the service station attendant for a can in which he could put some gasoline and take it to his friend. The attendant, who made the identification in question, procured a round 5-gallon Franklin Floor Cleaner can, which looked like the can later found at the scene of the fire, and filled it with 4 gallons of gasoline. The defendant placed the can on the floor of the passenger's side of the front portion of the automobile he was driving, and left.

The Franklin Floor Cleaner can obtained from the plant on the morning of the fire contained a small amount of a

liquid substance which was analyzed and determined to be a premium grade gasoline.

A few days after the fire a deputy sheriff noted the presence of imprints on the front floor mat of defendant's automobile on the passenger's side, consisting of three arcs. By measurement these arc stains could have been made by the bottom of the floor cleaner can found at the fire; and, in the opinion of a criminalist who examined and tested them, were caused by a petroleum derivative.

Two days after the fire, in the presence of the service station attendant and from information furnished by him, a deputy sheriff made a sketch of the person described by the attendant as the man who purchased the gasoline placed in the floor cleaner can. This sketch was admitted as an exhibit.

The defendant attacks the credibility of the service station attendant in an attempt to establish that the testimony given by him does not constitute substantial evidence. The detailed examination of this witness, both on direct and cross, produced the result which such an examination obtains with respect to the testimony of many witnesses. Seeming inaccuracies and inconsistencies appear, but these do not entirely destroy the credibility of the witness as a matter of law. The issue remains as one for the jury to determine.

"In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be positive or in a manner free from inconsistencies.

It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainties of the witnesses in giving their testimony. Unless the evidence of identity is so weak as to constitute no evidence at all, this court cannot set aside the decision of the trial court." (*People v. Shaheen,* 120 Cal.App.2d 629, 637 [261 P.2d 752]; *People v. Treggs,* 171 Cal.App.2d 546, 550 [341 P.2d 347]; *People v. Mazza, supra,* 135 Cal.App.2d 587, 598.)

The defendant contends that he did not purchase any gasoline as related by the service station attendant; attributes the mat stains to a gasoline can used to carry gasoline for a power lawn mower and a child's motorcar; and claims that he was in Las Vegas on the night of the fire. On the day before, *i.e.,* November 14th, he was with Mrs. Gradwohl at the plant. It was the afternoon of this day that she gave him the $1,000 cashier's check. According to his story, he mailed the check home; went to Las Vegas, gambled until 2:30 a. m.; purchased some gasoline on the outskirts of Las Vegas; re-

turned to his home in West Covina, arriving about 6 or 6:30 a. m. He also testified that he had purchased some gasoline on his return trip some time between 5:30 and 6 a.m. at a place called "Summit," which is between Victorville and San Bernardino. About 9:30 on this morning, after getting home, the defendant telephoned the doll factory and talked to Mrs. Gradwohl's nephew who informed him of the fire. The defendant told the nephew that he would come to the plant and, over the nephew's protests, advised that he would bring an adjuster with him. Thereupon he contacted a representative of Sidney Greenspan and Company, an adjustment agency representing the interests of assureds in cases of fire loss, which previously had been employed in connection with a fire loss by a firm of which the defendant had been president. At about 3:30 on that afternoon he and the adjuster called at the plant; saw Mrs. Gradwohl; and discussed the matter of engaging the Greenspan Company to adjust the fire loss. Relying upon the advice of the defendant, and over the objection of her nephew who complained of the fee, Mrs. Gradwohl employed the Greenspan firm. The adjustment agency undertook its work; prepared an inventory of the premises; and determined the extent of the loss to be $113,836.05. This information was given to Mrs. Gradwohl in December. In January of the following year she made changes in the figures and reestimated the loss at $185,000.

The defendant testified that on November 16, 1958, the day after the fire, Mrs. Gradwohl's nephew telephoned and told him that a deputy sheriff had said that he, the defendant, was a definite suspect; and that, forthwith, he called his uncle in Las Vegas and told him that it might be imperative that certain people remember that he, the defendant, was in Las Vegas on the night of November 14th and the morning of November 15th. The defendant further testified that he arrived in Las Vegas on the night of November 14th about 9 o'clock; stayed at the Tropicana until 10 or 10:30 where he gambled and had something to eat, being served by a waitress whom he knew; then went to the Desert Inn where he remained until 12 or 12:30, and while there saw Mr. and Mrs. Hal Silbert and Rose English; then left there and went to the Silver Slipper, and while there saw Sherlock Feldman, Joe Manuell, Tony or Joe Cornero, Hank Henry and Teddy Sampson; that he won some money at the Silver Slipper; that his winnings were paid partly in cash and partly by the issuance of a $1,000 receipt in place of cash; that Teddy

Sampson was the cashier; and that he left the Silver Slipper at 2:15 or 2:30 a. m.

Teddy Sampson testified that he did not come on duty on this occasion until 2:45 a. m., and he did not recall issuing any receipt to the defendant. The defendant also testified that on November 18th, two days after he called his uncle, he went to Las Vegas and talked with some people who, purportedly, had seen him there on November 14th; he also cashed in his $1,000 receipt. It is strange that he would have parted with this receipt, if in truth it had been issued to him, when the purpose of his trip to Las Vegas on November 18th was to firm up any evidence which might support his alibi. According to his testimony, the receipt was dated and had been given to him on the early morning of November 15th. He made no copy of this receipt and did not know who cashed it for him.

About a week later, on November 24th, when questioned by a deputy sheriff, in the presence of two other officers, the defendant stated that he had been in Las Vegas on the night of November 14th and the early morning of November 15th, arriving home about 5:30 or 6 o'clock a. m. on the latter day; that he gassed his car in Las Vegas before leaving and again in San Bernardino—later he changed this place to a place called "Summit"; that while in Las Vegas he gambled at the Tropicana, then at the Desert Inn and then returned home— he did not mention the Silver Slipper; and that he did not have anyone who could vouch for his presence while he was in Las Vegas—which was in conflict with his testimony at the trial. The deputy sheriff told him that if he had anyone who could vouch for his presence in Las Vegas on the occasion in question that he, the deputy, would check out this information. The defendant testified that he offered to take the officers to Las Vegas and prove his alibi. The officers testified that he made no such offer.

When Mrs. Gradwohl learned that the defendant was a suspect, she advised him to talk to her attorney to whom she telephoned and who, thereafter, became his counsel in the instant case.

The foregoing testimony adequately establishes the defendant's participation in the offense charged, a motive therefor, and an inference of guilt based on false and conflicting statements. (*People* v. *Richard,* 101 Cal.App.2d 631, 636 [225 P.2d 938].)

[██ Willful falsification of matters related materially

to the issue of a defendant's guilt or innocence "cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances, and thus are admissions of guilt." (*People* v. *Osslo,* 50 Cal.2d 75, 93 [323 P.2d 397].) The fact that an alibi is a fabrication is an incriminating circumstance which may be considered along with other evidence in determining guilt. (*People* v. *Tom Woo,* 181 Cal. 315, 327 [184 P. 389].)

The evidence showing defendant's interest and participation in the affairs of the Terri Lee Enterprises was sufficient to establish a motive on his part to obtain immediate monetary assistance for a failing business in which he was interested. Whether his interest in the business was direct or indirect and of such an impelling force as to lead him to commit the offense of arson was a proper subject of inference from the evidence presented.

" 'Whatever fact tends legitimately and fairly, according to the ordinary operation of the human mind and the ordinary principle of human conduct, to show motive, may properly be given in evidence, in proof of any assumed motive for the commission of crime.' " (*People* v. *Brown,* 130 Cal. 591, 594 [62 P. 1072].)

Proof of the presence or absence of motive is material as evidence tending to refute or support the presumption of innocence. (*People* v. *Tom Woo, supra,* 181 Cal. 315, 328; *People* v. *Weston,* 169 Cal. 393, 396 [146 P. 871]; *People* v. *Soeder,* 150 Cal. 12, 15 [87 P. 1016].)

The defendant cites the cases of *People* v. *Seltzer,* 107 Cal.App.2d 627 [237 P.2d 689], and *People* v. *Angelopoulos,* 30 Cal.App.2d 538 [86 P.2d 873], in support of his position that the evidence in the case at bar is not sufficient to sustain the verdict. However, when all of the facts in the cited cases are compared with all of the facts in the instant case, a clear distinction in material aspects is apparent. The evidence in the case before us sufficiently supports the verdict. The defendant's contention to the contrary is without merit.

### ALLEGED ERRORS

The defendant objects to certain evidence which he contends was admitted on the issue of conspiracy. He was not charged with the crime of conspiracy, but with the crime of arson. However, under well-settled rules, evidence of a conspiracy to commit the offense with which a defendant is charged is admissible upon a trial of that charge even though

the fact of a conspiracy is not alleged in the information filed against him. (*People* v. *Tanner*, 3 Cal.2d 279, 299 [44 P.2d 324]; *People* v. *Massey*, *supra*, 151 Cal.App.2d 623, 651; *People* v. *Gardner*, 147 Cal.App.2d 530, 537 [305 P.2d 614]; *People* v. *Rivas*, 92 Cal.App.2d 663, 668 [207 P.2d 1062]; *People* v. *Duran*, 57 Cal.App.2d 363, 371 [134 P.2d 305]; *People* v. *Weaver*, 56 Cal.App.2d 732, 741 [133 P.2d 818]; *People* v. *Gregory*, 12 Cal.App.2d 7, 15 [54 P.2d 770].)

The evidence objected to was material on other issues besides that of conspiracy. Evidence of the defendant's association with Mrs. Gradwohl, his knowledge of her business ventures and transactions, his interest therein, and his activities with respect thereto, were material to the issue of motive; furnish a reason for his commission of the offense; assist the trier of fact in interpreting other evidence by unfolding the relationship between the defendant and other persons who were witnesses, such as Mrs. Gradwohl's nephew and the fire adjuster; is proof of knowledge by the defendant of the physical properties of the plant, including its fire-resistance capabilities, the need for several fires, and the means of access; and was relevant to a consideration of the weight of the testimony, particularly that of Mrs. Gradwohl and of the defendant. The testimony of Mrs. Gradwohl with respect to her corporate setup, her indebtedness, her insurance coverage and her inventory was foundational to proof of knowledge of these facts by the defendant, whose activities indicated more than the passing concern of an employee in the affairs of his employer.

Immediately preceding the culmination of the People's case, the defendant moved the court to strike all of the testimony on the issue of conspiracy. The court denied this motion on the ground that there was a prima facie showing of a conspiracy. The motion was in proper form; was directed to specific evidence; and there is no contention that the denial was based on any irregularities in its presentation. As the evidence was admissible on issues other than that of conspiracy, the order of denial was not error. In addition, the determination of the trial court that a prima facie showing of conspiracy had been made, was correct. The defendant contends that this evidence shows only an association between him and Mrs. Gradwohl, not a conspiracy. There is no merit in this contention. Besides showing an association between the defendant and Mrs. Gradwohl over a period of two years, the evidence in question also was proof of a business relationship between them which, if

not strictly confidential in character, bordered upon that status, as the defendant was given the opportunity to know all of the business affairs of Mrs. Gradwohl; was her financial adviser; was consulted about new business ventures; knew that $100,000 had been embezzled from her, and that her indebtedness approximated $1,000,000; loaned her money; cashed her checks; paid overdue bills; contemplated buying an interest in the business; was considered for the position of general manager; and was the recipient of her concern and activity in obtaining legal counsel to represent him in the matter at hand. The evidence in question was proof that the defendant not only had knowledge of the pressing financial difficulties of Mrs. Gradwohl's business and of his desire to assist her, but also that he had knowledge of her insurance program. As a person who had access to and examined the books and records of this business, it may be inferred that he had knowledge of the status of her insurance. During the course of his telephone conversation with Mrs. Gradwohl's nephew on the morning of the fire, the defendant volunteered his intention to bring a representative of an adjustment agency to the plant. The inference is evident that he must have known that the property was covered by insurance; otherwise, there would have been no reason for the services of an adjustment agency. The defendant's concern respecting an immediate insurance recovery, evidenced by his participation in effecting an immediate adjustment of the fire loss, and Mrs. Gradwohl's concern that he should obtain legal counsel when she learned that he was a prime suspect in the arson investigation, are further cogent factors tending to establish the existence of a conspiracy.

Another incriminating fact is the payment of $1,000 by Mrs. Gradwohl to the defendant the day before the fire. The contention that the People were bound by Mrs. Gradwohl's explanation for this payment, because she was called as a witness by the prosecution, overlooks the proposition of law that the judge and the jury were not bound to accept her explanation. (*Holland* v. *Morgan & Peacock Properties Co.,* 168 Cal.App.2d 206, 211 [335 P.2d 769]; *Cook* v. *Sanger,* 110 Cal.App. 90, 100 [293 P. 794].) They were entitled to draw any inference reasonably deducible from the evidence as a whole.

For the purpose of permitting a consideration of the acts and declarations of a coconspirator, to the end of proving the defendant's guilt of a crime charged, the existence

of a conspiracy is sufficiently established by prima facie proof of that fact. (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Bentley,* 75 Cal. 407 [17 P. 436]; *People* v. *Massey, supra,* 151 Cal.App.2d 623, 642; *People* v. *Frankfort,* 114 Cal.App.2d 680, 699 [251 P.2d 401]; *People* v. *Sica,* 112 Cal.App.2d 574, 583 [247 P.2d 72].) ▮ Direct evidence of the existence of an unlawful agreement is not essential to proof thereof (*Lorenson* v. *Superior Court,* 35 Cal. 2d 49, 57 [216 P.2d 859]), for experience has demonstrated that, as a general proposition, a conspiracy can only be established by circumstantial evidence (*People* v. *Osslo, supra,* 50 Cal.2d 75, 94; *People* v. *Robinson,* 43 Cal.2d 132, 136 [271 P.2d 865]; *People* v. *Massey, supra,* 151 Cal.App.2d 623, 651; *People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065]), and sometimes may " 'be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " (*Revert* v. *Hesse,* 184 Cal. 295, 301 [193 P. 943].) ▮ The evidence in the instant case satisfies the requirements of the law in the premises. The contention of the defendant respecting its inadmissibility and insufficiency is without merit. No error occurred in denying the motion to strike.

▮ Over objection, the court admitted into evidence a "sketch" of the person who purchased gasoline from the service station attendant. The "sketch" had been made by a deputy sheriff under the direction of the attendant two days after the fire. The attendant was a witness at the time of the trial; identified the defendant as the person who had purchased the gasoline; and testified that the "sketch" was made in his presence from information which he gave the deputy sheriff. ▮ Proof of an extrajudicial identification of a defendant as the culprit, which is made shortly after the commission of an offense, is admissible as independent evidence of identification when the person making the same is available at the trial for cross-examination. (*People* v. *Gould,* 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865].) ▮ Admission of the foregoing testimony and the "sketch" was not error.

The defendant, on cross-examination, was asked his age and replied that he was 29. Thereupon he was asked: "Isn't it a fact, sir, that you were 39 years of age on November 15th, 1958?" Over objection he answered: "I was not." The reason for this question arose out of a statement by the service station attendant that the man to whom he sold the gasoline

had greying hair and appeared to be a person in his late thirties. Actually the defendant did have greying hair, but at the time of the trial it did not appear so because it had been dyed. After the foregoing answers, the following occurred: By the deputy district attorney: "Mr. Miller, on June 4th of 1959 you made a reapplication for a driver's license, didn't you?" By counsel for defendant: "Objected to as the application is the best evidence." The objection was sustained. Thereupon, over objection of the defendant, certified copies of his applications for a driver's license made in 1959, 1957 and 1953, in which he had stated that his birth date was April 22, 1919, instead of April 22, 1929, were admitted "merely to show a statement of date of birth." The objection made to the admission of these certificates was upon the ground that the information contained therein was confidential. On appeal, the defendant also contends that no impeachment foundation had been laid for their admission as required by section 2052 of the Code of Civil Procedure.

 Section 1808 of the Vehicle Code provides that the information contained in an application for a driver's license which relates "to the physical or mental condition of any person" is confidential. Section 12800 of that code prescribes the information which must be contained in such an application, listing 11 different subdivisions, among which are: "(a) The applicant's true full name, age, sex, and residence address. . . . (g) Whether the applicant has the normal use of both hands and feet. (h) Whether the applicant has ever been afflicted with epilepsy, paralysis, insanity, or other disability or disease affecting his ability to exercise reasonable and ordinary control in operating a motor vehicle upon a highway." It is apparent that the information concerning the "physical or mental condition" of the applicant which is made confidential by the statute, is that required by the foregoing subdivisions numbered (g) and (h), and not that required by subdivision numbered (a). For the purpose under consideration, the information contained in the application for a driver's license with respect to the applicant's age is not information relating to his physical or mental condition.

 The impeachment foundation for admission of these certificates was cut short by the defendant's objection that the applications were the best evidence. The court sustained this objection. Admission of the certificates followed. The defendant invited the procedure adopted by the court and may not

complain of it at this time. (*People* v. *Simmons*, 28 Cal.2d 699, 722 [172 P.2d 18].)

On appeal the defendant also contends that the age information contained in his application is immaterial; that it has no bearing on the "visual description" related by the service station attendant. Whether the defendant looked like he was in his late thirties and in truth was in his late thirties, or whether, because of his greying hair, he looked like a person in his late thirties but in truth was a person in his late twenties, or whether he dyed his hair to make him look like a person in his late twenties or for some other reason, evidence as to his chronological age was admissible for consideration in weighing the testimony which involved these factors. It also is claimed that the deputy district attorney misused the applications to discredit the defendant's credibility. In his argument to the jury the deputy pointed out that in these applications the defendant had falsely stated his age under oath. No objection was made at the time this alleged misconduct occurred. Any objection to an argument which misuses testimony admitted for a limited purpose is waived unless the court is requested to instruct the jury to confine its consideration of such evidence to the limited purpose. (*People* v. *White*, 50 Cal.2d 428, 431 [325 P.2d 985].) The fact that the defendant made these false statements under oath was inquired into upon his examination without objection. As a general rule, the failure to make timely objection to the admission of testimony precludes an objection thereto on appeal. (*People* v. *Millum*, 42 Cal.2d 524, 526 [267 P.2d 1039].) No reversible error appears from these contentions.

 During the course of the defendant's cross-examination he was asked a series of questions about persons he had seen while at Las Vegas on the night of November 14th. After giving the names of some of these people he was asked: "Who else did you see that you knew at the Desert Inn?" Instead of answering the question, the defendant asked for permission to consult with his counsel for a moment. The court stated that he saw no reason for such a conference. The defendant insisted that he would rather not answer the question until a later time; in response to a question from the court, declared that his refusal was not because it would incriminate him; in response to a question from the deputy district attorney, said it would not embarrass him to answer the question at that time but that it would embarrass the district attorney's office.

Thereupon the defendant was instructed to answer the question; again refused to answer, stating that some of his other witnesses had been intimidated; was admonished by the court to desist from such an explanation and to answer the question, otherwise he would be held in contempt; and then refused to answer upon the ground it might incriminate him. Thereupon the court took a recess. After the recess the defendant apologized to the jury and the attorneys for his actions; was asked the question: "What was the name of the other person that you saw at the Desert Inn that you knew?"; and replied: "Mr. and Mrs. Hal Silbert." To the question: "S-I-L-B-E-R-T?", he replied: "That's right." After a four-day recess, the defendant testified that he was mistaken as to the name of these people and wished to correct the name to "L-I-T-B-E-R-G."

Objection is taken to the foregoing procedures upon the ground that the court deprived the defendant of his right to counsel; made him acknowledge that there was something that might incriminate him; discredited his credibility; and left the impression that he was evasive.

Every court has the inherent power, in furtherance of justice, to regulate the proceedings of a trial before it; to effect an orderly disposition of the issues presented; and to control the conduct of all persons in any manner connected therewith. (Code Civ. Proc., § 128; *Hays* v. *Superior Court,* 16 Cal.2d 260, 264 [105 P.2d 975]; *Cantillon* v. *Superior Court,* 150 Cal.App.2d 184, 187 [309 P.2d 890].) The exercise of this power is a matter vested in the sound legal discretion of the trial court, subject to reversal on appeal only in those instances where there has been an abuse of that discretion. (*Kraft* v. *Nemeth,* 115 Cal.App.2d 50, 52 [251 P.2d 355]; *Gunn* v. *Superior Court,* 76 Cal.App.2d 203, 205 [173 P.2d 328]; *Potapoff* v. *Mattes,* 130 Cal.App. 421, 426 [19 P.2d 1016].)

The refusal of the trial court to permit the defendant to speak to his counsel in the midst of his cross-examination did not constitute an infringement upon his constitutionally guaranteed right to counsel. This right assures a defendant of every reasonable opportunity to consult with his counsel in the preparation and presentation of his defense (*Cornell* v. *Superior Court,* 52 Cal.2d 99, 102 [338 P.2d 447]; *In re Ochse,* 38 Cal.2d 230, 231 [238 P.2d 561]; *People* v. *Sarazzawski,* 27 Cal.2d 7, 17 [161 P.2d 934]; *People* v. *Boyden,* 116 Cal.App.2d 278, 284-285 [253 P.2d 773]; *People* v. *Zammora,* 66 Cal.App.2d 166, 234 [152 P.2d

180] ; *People* v. *Bennett*, 79 Cal.App. 76, 97 [249 P. 20]), but does not confer upon him the right to obstruct the orderly progress of a trial. ▮▮▮ It has been declared to be a "sound concept that it is the duty of the court to safeguard and promote the orderly and expeditious conduct of its business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper or delay the conduct and dispatch of its proceedings." (*People* v. *Mattson*, 51 Cal.2d 777, 792 [336 P.2d 937].) The right to the aid of counsel is not without its limitations. (*People* v. *Mattson*, *supra*, 51 Cal.2d 777, 789-797; *In re Connor*, 16 Cal.2d 701, 709 [108 P.2d 10] ; *People* v. *Gonzales*, 151 Cal. App.2d 112, 115 [311 P.2d 53] ; *Altmayer* v. *Sanford*, 148 F.2d 161, 162; *Creech* v. *State*, 70 Tex.Crim. 229 [158 S.W. 277, 281].) ▮▮▮ We conclude that the action of the trial court in requiring the defendant to answer the question propounded to him without first conferring with his counsel constituted a valid exercise of its discretion. Likewise, the admonition to the defendant that he would be in contempt of court if he did not answer, was a lawful exercise of the court's discretion. Any implications adverse to the defendant which might have arisen from the fact that he continued to refuse to answer and placed his refusal upon the stated ground that his answer would incriminate him, are attributable to the defendant and not to the court.

Moreover, at the time, apparently the defendant attached no importance to the court's remarks; he neither objected to them nor requested that the jury be admonished to disregard them; and he may not now urge them as grounds for reversal. (*People* v. *Amaya*, 40 Cal.2d 70, 78 [251 P.2d 324] ; *People* v. *Avery*, 35 Cal.2d 487, 493 [218 P.2d 527].)

▮▮▮ The defendant refers to the fact that the deputy district attorney, in his argument to the jury, commented upon this incident; the reasons advanced by the defendant for not answering the question; and the difference in the names of the persons he claimed to have seen at the Desert Inn. These comments were permissible. (*People* v. *Eggers*, 30 Cal. 2d 676 [185 P.2d 1] ; *People* v. *Kynette*, 15 Cal.2d 731, 757 [104 P.2d 794] ; *People* v. *Molina*, 126 Cal. 505, 508 [59 P. 34] ; *People* v. *Dyer*, 30 Cal.App.2d 590, 593 [86 P.2d 852].)

The accusation that the remarks of the court at the time in question deprived the defendant of a fair trial because of their alleged tendency to reflect adversely upon his credibility is without merit.

The president of the fire adjustment company which was employed to adjust the Terri Lee fire loss, after the defendant had brought one of its representatives to the plant on the day of the fire, testified that his company, three years previously, had been engaged by a corporation of which the defendant was president to adjust a fire loss, and as a result of the adjustment so made the corporation received $185,488 from the insurance carriers. This testimony was admitted over objection of the defendant. The witness also testified that in the course of the prior adjustment he had contacted the defendant on 20 or 30 different occasions. The defendant contends that the admission of this testimony was error; relies upon the ''general rule that evidence of other crimes, where it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, should be excluded because its probative value is outweighed by its prejudicial effect'' (*People* v. *Westek*, 31 Cal.2d 469, 476 [190 P.2d 9]), and cited *People* v. *Channell*, 136 Cal.App.2d 99, 110 [288 P.2d 326] and *People* v. *Burns*, 109 Cal.App.2d 524, 553 [241 P.2d 308, 242 P.2d 9]. There is no showing that the previously adjusted loss was caused by a fire of incendiary origin. Nevertheless, the defendant claims that the testimony objected to has implications to this effect and should be excluded.

''The general tests of the admissibility of evidence in a criminal case are: . . .

''. . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.'' (*People* v. *Sanders*, 114 Cal. 216, 230 [46 P. 153]; *People* v. *Peete*, 28 Cal.2d 306, 315 [169 P.2d 924]; *People* v. *Sykes*, 44 Cal.2d 166, 170 [280 P.2d 769].)

The evidence in question was material to the relationship existing between the defendant and the fire adjustment company employed by Mrs. Gradwohl. It shows the defendant's knowledge of a procedure which had proven effective in obtaining a satisfactory recovery under a fire insurance policy; that he knew of a fire adjustment agency capable of successfully presenting a sizeable claim; and, in turn, is basic to an inference that the defendant was interested

in the recovery which might be obtained on account of the fire at the Terri Lee plant. Evidence of his interest in the insurance, in the adjustment of the loss and in obtaining the services of a firm with which he was acquainted; of his experience with that firm; and of his knowledge respecting the procedures to be taken, were material to the issue of motive. The evidence objected to was admissible under the rule heretofore stated. (*Cf.* generally *People* v. *Miller,* 41 Cal.App.2d 252, 256 [106 P.2d 239]; *People* v. *Bragdon,* 103 Cal.App. 20, 24 [283 P. 881].)

The defendant also contends that the giving of four instructions relating to the issue of conspiracy misstated the law. The first of these instructions advised the jury with respect to the joint responsibility of persons forming a criminal conspiracy; the second instructed that a conspiracy may be proven by circumstantial evidence; the third was identical to an instruction proposed by the defendant and told the jury that the act or declaration of an alleged conspirator is not binding on any other alleged conspirator until the existence of a conspiracy is proven independently of such act or declaration; and the fourth, which also was identical to an instruction proposed by the defendant, instructed that an agreement did not amount to a criminal conspiracy unless there was proof of an overt act which was done to accomplish the purpose of the agreement; defined the term ''overt act''; and stated that it was necessary to the guilt of any particular defendant that he directly commit the overt act himself.

The jury properly was instructed on the issue of conspiracy. (*People* v. *Tanner, supra,* 3 Cal.2d 279, 299; *People* v. *Gardner, supra,* 147 Cal.App.2d 530, 537; *People* v. *Talbott,* 65 Cal.App.2d 654, 664 [151 P.2d 317].) Proof of a conspiracy in the instant case, was relevant to the issue of the defendant's guilt (*People* v. *Bentley,* 75 Cal. 407, 409 [17 P. 436]; *People* v. *Carson,* 155 Cal. 164, 172 [99 P. 970]) and foundational to the admission of evidence of certain acts and declarations of his coconspirator. (*People* v. *Massey, supra,* 151 Cal.App.2d 623, 642; *People* v. *Talbott, supra,* 65 Cal.App.2d 654, 661.)

The defendant complains that the instructions in question did not make the distinction between the use of evidence of a conspiracy in proof of the crime charged and the use of such evidence to prove the crime of conspiracy; that the defendant was not charged with the crime of conspiracy; that the jury may have interpreted the instructions to mean that

he was so charged; and may have found him guilty thereof upon determining that a conspiracy existed. He also contends that the prejudicial nature of this alleged vice in these instructions was augmented by the fact that the jury may have received the impression therefrom that he could be found guilty of the offense of a criminal conspiracy by proof which did not establish his guilt thereof beyond a reasonable doubt. A reading of the instructions as a whole does not support these contentions. The jury was told that the defendant was charged with the crime of arson; that he was presumed to be innocent of this charge and was entitled to an acquittal if there was a reasonable doubt of his guilt; that ''Evidence has been admitted in this case which may tend to prove the existence of an uncharged criminal conspiracy. If you believe from the evidence that such a conspiracy did in fact exist, and that the charged crime of Arson was committed in the pursuance of that conspiracy, then you may consider that conspiracy as being evidence tending to show the guilt of the defendant. The weight to be given to such evidence, and the significance, if any, to be attached to it, are matters for the jury to determine.'' They were not told that the defendant was charged with the offense of conspiracy, and the use in the allegedly objectionable instructions of the terms ''liable,'' ''criminal conspiracy,'' ''criminally responsible'' or ''conspiracy punishable in California,'' and reference to the legal responsibility of one conspirator for the acts of another, could not have misled the jury to believe otherwise. The record is clear that the defendant alone was charged with setting the doll factory fire. There is no indication of any claim that some other person set this fire and that he was criminally responsible therefor because of the existence of a conspiracy between himself and the person who caused the same.

 ''Questionable and incomplete instructions may be rendered innocuous if it is clear, when they are read and considered with the other instructions, that the jury was not misled.'' (*Jentick* v. *Pacific Gas & Elec. Co.*, 18 Cal.2d 117, 121 [114 P.2d 343].)

The defendant cites the case of *People* v. *Weiss*, 50 Cal.2d 535, 563 [327 P.2d 527] in support of his position. The objectionable features of the instructions considered in the cited case are not a part of the instructions given in the case at bar. Moreover, the instruction which is the object of defendant's most severe criticism, *i.e.*, the instruction referring

to a "conspiracy punishable in California"; defining an "overt act"; referring to the "guilt" of a conspirator; and charging that the "overt act" need not be the ultimate object of the conspiracy, was identical in form and substance to an instruction proposed by the defendant. If the giving of this instruction was error, it was an error invited by the defendant of which he may not now complain. (*Jentick* v. *Pacific Gas & Elec. Co., supra,* 18 Cal.2d 117, 122; *Yolo Water & Power Co.* v. *Hudson,* 182 Cal. 48, 51 [186 P. 772]; *People* v. *Harlan,* 133 Cal. 16, 23 [65 P. 9].) Twenty-five proposed instructions on the issue of conspiracy were submitted to the court; 11 by the People and 14 by the defendant. Of these, the court gave 8 proposed by the People and 9 proposed by the defendant. The terms "criminal conspiracy" and "criminally liable" appear in some of the defendant's instructions on this issue. His contention of prejudicial error in the premises is without merit.

The defendant requested and the court gave an instruction that, "If the crime of Arson, the commission of which is alleged in the information, was committed by anyone, then, under the evidence in this case and as a matter of law, the witness Violet Gradwohl was an accomplice." ▮▮▮ When an accomplice is called as a witness by the People, the court must instruct the jury as to the rules of law governing their consideration of his testimony even though no request is made therefor. (*People* v. *Hamilton,* 33 Cal.2d 45, 51 [198 P.2d 873]; *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367]; *People* v. *Warren,* 16 Cal.2d 103, 116 [104 P.2d 1024]; *People* v. *Ahern,* 113 Cal.App.2d 746, 749 [249 P.2d 63]; *People* v. *Crain,* 102 Cal.App.2d 566, 582 [228 P.2d 307]; *People* v. *Melone,* 71 Cal. App.2d 291, 297 [162 P.2d 505].) This requirement appears to be limited to those instances where the accomplice is called by the People, and does not apply where the accomplice is called by the defendant and he does not request such an instruction. (*People* v. *Melone, supra,* 71 Cal.App.2d 291, 297; *People* v. *McEvers,* 53 Cal.App.2d 448, 453 [128 P.2d 93].) In the instant case the court gave instructions in accord with the provisions of section 1111 of the Penal Code, *i.e.,* that a conviction may not be had upon the uncorroborated testimony of an accomplice, and also in accord with the provisions of section 2061, subdivision 4, of the Code of Civil Procedure, *i.e.,* that "the testimony of an accomplice ought to be viewed with distrust." ▮▮▮ The failure to give the latter instruction when the accomplice is called as a witness by the People may

constitute reversible error. (*People* v. *Dail,* 22 Cal.2d 642, 653-656 [140 P.2d 828] ; *People* v. *Ahern, supra,* 113 Cal.App. 2d 746, 749.)

Mrs. Gradwohl was called as a witness by the People and was examined extensively. There was no cross-examination. Instead, during the presentation of his case, the defendant called her as his witness, at which time she was examined on direct by his attorney, and on cross by the deputy district attorney. The defendant urges these circumstances as a basis for error in giving the instruction that the testimony of an accomplice ought to be viewed with distrust. In full, this instruction states:

"It is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

Reliance is placed on the decision in *People* v. *Hartung,* 101 Cal.App.2d 292, 295 [225 P.2d 614], which holds that "it is error to give such an 'instruction when an accomplice is called as a witness on behalf of the defendant . . . as its effect is to discredit one of defendant's witnesses and thereby . . . trench upon his constitutional rights by invading the province of the jury.' " On the other hand, in *People* v. *Watson,* 113 Cal.App.2d 799, 803 [249 P.2d 38], the giving of such an instruction was held not to be error where one witness, allegedly an accomplice, was called by the People, and another accomplice witness was called by the defendant. In the latter case the court held that the instruction as there given "was directed solely to prosecution witnesses who are found to be accomplices." In the cited case, the instruction regarding the untrustworthiness of an accomplice's testimony was given as a part of a general instruction including a charge respecting the necessity for corroboration, the requisites of such corroboration, and the definition of an accomplice. The instruction in the case at bar was one of several on the general subject and included the same matters as those included in the foregoing general instruction considered in the cited case. The reasoning of the decision in *People* v. *Watson, supra,* 113 Cal.App.2d 799, 803, is applicable to the situation at hand. In addition, to permit the defendant in this case to claim error in the giving of the instruction under consideration would

pervert the purposes of justice. Under the authorities heretofore noted and the circumstances of this case, a failure to give that instruction would have been error. It was given for the benefit and protection of the defendant. If this benefit was outweighed by a disadvantage attributable to the fact that the witness was called by him, as well as by the People, he should have informed the trial court of his wishes in the premises, *i.e.*, whether to accept or reject the instruction. If the allegedly objectionable instruction had not been given, it is more than likely that the defendant would now be complaining because of such failure. He may not sit silently during the course of his trial; create a situation which may be to his advantage or disadvantage and require the court to make an election on his behalf without being bound by that election. He must make his own election and advise the court thereof by requesting an instruction acceptable to him, or in some other appropriate manner. To proceed otherwise is to require the court to choose one of two alleged evils and reserve to the defendant the right to claim error irrespective of the choice made. This does not comport with justice. Analogous applicable principles of law are found in the rules which foreclose a consideration of invited error (*People* v. *Sternberg,* 111 Cal. 3, 9 [43 P. 198] ; *People* v. *Contreras,* 167 Cal.App.2d 288, 290 [334 P.2d 208] ) ; require a party to make his election of remedies (*Herdan* v. *Hanson,* 182 Cal. 538, 542 [189 P. 440] ) ; or support a waiver or estoppel based on conduct. (*Myers* v. *McDonald,* 68 Cal. 162, 167 [8 P. 809].)

The defendant testified that Mrs. Gradwohl's nephew called him on November 16, 1958, to tell him that he, the defendant, was a suspect. In contradiction of this testimony, the nephew testified that he did not call the defendant until November 17, 1958. In support of his motion for a new trial, the defendant presented an affidavit by the nephew in which he acknowledged that he did call the defendant on November 16th instead of November 17th. The defendant urges that the failure to grant a new trial in order to show this change in testimony was error. The decision upon the ground thus presented as a basis for a new trial was a matter within the sound discretion of the trial court. (*People* v. *McGarry,* 42 Cal.2d 429, 432 [267 P.2d 254] ; *People* v. *Beard,* 46 Cal.2d 278, 281 [294 P.2d 29].) There is no showing that the order denying the motion constituted an abuse of discretion. The issue is one of little consequence; the revised testimony would not have changed the result.

The judgment and order denying the motion for a new trial are affirmed.

Griffin, P. J., and Shepard, J., concurred.

A petition for a rehearing was denied October 24, 1960, and appellant's petition for a hearing by the Supreme Court was denied November 23, 1960.