[Crim. Nos. 7417, 7526.   Second Dist., Div. One.   Apr. 4, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH BUCKLEY et al., Defendants and Appellants.

(Two Cases.)

Frank Duncan, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—By indictment appellants and others were charged with conspiracy (14 overt acts being alleged) to commit grand theft and forgery and to cheat and defraud by false pretenses (count I); they were also accused (counts II through XVIII) of forgery (Pen. Code, § 470) in the making and passing of credit purchase vouchers and others, the victim in each instance including the owner of a stolen credit card presented during the course of the respective trans-

actions. Following conviction by a jury,[1] and the denial of motions by Daston and Sciandra for new trial, Buckley and Daston were granted probation; Sciandra and Hosney were sentenced to state's prison.

In No. 7417 the appeal is from the judgment or the order granting probation (as the case may be), and the order denying Daston and Sciandra a new trial. In No. 7526 Hosney has appealed from the judgment; the assignment of a separate number thereto arises solely from the fact that Hosney's notice of appeal was received by the clerk of the trial court after the expiration of the prescribed period—relief was thereafter given for good cause appearing (Rules on Appeal, rule 31(a)) and a separate clerk's transcript prepared. For the further reason that the brief on file reflects that it is on behalf of Hosney as well and the remaining defendants, the two appeals will be considered together.

The sufficiency of the evidence to support the determination of guilt is not challenged; however, a recital of the salient facts becomes necessary in view of appellants' claim that certain errors in the conduct of the trial operated to their prejudice or, as stated in *People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243], make it " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "

Early in January of 1960, Herman Wahl was the owner of several credit cards which, it appears, he had not signed. Upon discovery that they were missing, he notified the companies concerned: Carte Blanche, American Express and BankAmericard. Shortly thereafter Wahl's card was presented at various business establishments in the Hollywood and Beverly Hills areas, and his signature (admittedly forged) appeared on sales drafts or vouchers for credit extended pursuant to such cards.

During the late evening of January 17, 1960, several credit cards (as well as a permanent driver's license) issued to John Von Neumann were stolen; within a few days they likewise were presented at several places of business in the same general areas in connection with credit purchases. Von Neumann testified that the signatures on the various credit vouchers

---

[1]Buckley was found guilty as to counts I, II through V, X, XI, XIII and XIV. Daston was found guilty as to count I only. Sciandra and Hosney were found guilty of the offenses charged in all counts. Charges against two other defendants, Goldfarb and Hernandez, were dismissed (Pen. Code, § 1099); they thereupon testified for the People.

were not his; in that connection there was handwriting testimony that the signatures on one of such vouchers was that of appellant Buckley, while another voucher bore the signature of one Hammer, a codefendant who did not appeal. Von Neumann's driver's license was subsequently mailed to him on January 18. Meantime, a temporary license made out to Von Neumann without his authorization was issued at the Hollywood office of the Department of Motor Vehicles. The signature eventually appearing thereon was Buckley's.

Upon being called as a prosecution witness, Goldfarb testified to a gathering in the Hollywood home of appellant Daston on January 11, 1960. Present were appellants Sciandra, Daston and Buckley as well as Daston's wife and codefendant Hernandez. The group was told by Sciandra that he knew where credit cards could be obtained; after making a phone call, Sciandra stated that he had spoken to a certain person whom they should meet. Later the same day, Sciandra, Hernandez and Goldfarb went to the home of appellant Hosney. Sciandra produced three credit cards issued to Herman Wahl, stating (in Hosney's presence) that Hosney wanted $200 apiece for the cards—the price, it was also specified, could be paid for in whiskey. Another meeting of the same group was held the evening of the same day at Daston's house. Daston was advised of, and agreed to, Hosney's proposition. Upon Buckley's arrival, Sciandra suggested that they go out and ascertain the value of the cards—there was a discussion to the effect that Buckley would sign his name "Herman Wahl" to any credit vouchers. Later that evening the group went to a liquor store on Sunset Boulevard. Buckley (with a credit card on his person) went in alone and shortly returned to the group with two bottles of champagne; he indicated that he had used the credit card in making the purchase.

For six successive days thereafter, according to Goldfarb, goods or meals were secured on credit vouchers at various stores and restaurants. One or more of the persons charged with conspiracy and the substantive offense was present on each occasion; sometimes Goldfarb would sign Wahl's name to the voucher and sometimes the latter's name would be signed by one of Goldfarb's codefendants.

On January 18, the day after the Von Neumann cards were stolen, Sciandra told Goldfarb that he had some new cards, given him by Hosney, which could be purchased for $150 each. Later that day there was a conversation between Goldfarb, Buckley and Sciandra in which Sciandra stated that

they would use the new cards in the same way as those issued to Wahl. Sciandra proposed that he and Buckley obtain a temporary driver's license if identification was requested at any of the places to be visited. Without detailing the mechanics of the criminal operations later carried out, it will suffice to observe that the same techniques employed with the Wahl cards resulted in numerous persons being victimized.

Hernandez, the other codefendant as to whom charges were dismissed (Pen. Code, § 1099), testified in substantiation of Goldfarb respecting matters occurring prior to January 17.

Additional testimony establishing the commission of the crimes charged in the indictment was given by managers or employees of various business establishments and restaurants. For example, the manager of a Sunset Boulevard liquor store recalled that he sold certain merchandise on January 12, 1960, involving a Carte Blanche credit voucher, and that some man signed the name Herman Wahl thereto. (There was handwriting testimony that the signature was that of appellant Buckley.) A salesman at a Beverly Hills music store testified that Buckley, Sciandra, Goldfarb and Kaseno (another defendant whose appeal was later abandoned) came into the store together on January 13; items totaling more than $900 were purchased and two Carte Blanche credit slips were signed by Buckley in the name of Herman Wahl. A waiter employed at the Luau Restaurant, Beverly Hills, stated that he served a party of eight (including Goldfarb) the night of January 13; that Goldfarb signed a Carte Blanche credit voucher (one of the People's exhibits) for the price of the dinner in the name of Herman Wahl. There was similar testimony from sales personnel relating to transactions at other stores in which either Wahl's or Von Neumann's cards were used; in each instance credit slips were signed by Buckley or one of his codefendants.

Buckley was arrested on January 19, at a Beverly Hills luggage shop. Among other things, he acknowledged to the police that he had agreed to be the signer on the Wahl credit cards; he also admitted that he obtained the temporary driver's license in the name of Von Neumann. Hosney was taken into custody on January 20. At that time he had in his possession a camera purchased the previous day by Buckley with a Carte Blanche card issued to Von Neumann; when confronted with the statement that other items found in his home had been similarly purchased, he told the officer that they belonged to Sciandra. Sciandra, who was present on this

occasion, first told the officer that he had never seen the items before; later he said that he had brought them over to Hosney to sell for him; still later, he admitted that he had made one purchase with Wahl's Carte Blanche card. Daston was arrested on January 22. He admitted that he knew the other appellants, stating that Sciandra asked him on January 13 if he was interested in using the Wahl credit cards—this proposal, he stated, was rejected. When asked if he and his wife had gone anywhere with anyone using the Wahl or Von Neumann cards and had been present when purchases were made therewith, Daston said he would have to speak to his attorney before he answered.

Each of the appellants testified in his own defense. Buckley denied participation in the conspiracy charged; while he admitted using some of the stolen cards and signing certain sales vouchers, he did so (he stated) without any intent to defraud—this, because Goldfarb had told him that a friend had given him the cards for certain business reasons, and he believed that Goldfarb had permission to use such cards. Daston and Hosney denied active participation in any of the transactions hereinabove related. Daston acknowledged that he knew the other appellants and that he had been at the Luau Restaurant on the evening of January 13 with a group which included Goldfarb; he also admitted being in a car with Buckley and Sciandra when Buckley made a purchase on January 12 at a liquor store on Sunset Boulevard. Hosney admitted meeting Sciandra, Goldfarb and Hernandez at his home on January 11 but denied that he had discussed the matter of credit cards. Sciandra's defense was similar to Buckley's, namely, he believed that Goldfarb had the use of the cards legitimately and was just a "big spender."

From the above recital of the salient facts, it is manifest that the evidence amply supports the determination of guilt. ▆▆▆ As to the conspiracy count, the uncorroborated testimony of the accomplice Goldfarb sufficiently established the corpus delicti. (*People* v. *Teitelbaum*, 163 Cal.App.2d 184, 214 [329 P.2d 157].) ▆▆▆ The existence of the conspiracy having been established, evidence of the acts and declarations of the alleged conspirators in furtherance of the unlawful agreement became admissible. (*People* v. *Calhoun*, 50 Cal.2d 137, 144 [323 P.2d 427].) As a result there was competent evidence of most, if not all, of the overt acts set forth in the indictment; only one of the alleged acts committed by one of the conspirators need be proved to support a verdict of

guilty. ▉ In this latter respect, "It is axiomatic that once a conspiracy is established it is unnecessary to prove that each conspirator personally participated in each of the several overt acts performed in furtherance of the conspiracy." (*People* v. *Chait,* 69 Cal.App.2d 503, 514 [159 P.2d 445].) As to the substantive offenses, the evidence likewise (and amply) sustains the findings of the jury. ▉ Buckley's and Sciandra's contentions that they did not "intend" to defraud the various victims are wholly without merit at this stage of the proceedings—the question of intent being essentially one of fact for the trier of fact. (*People* v. *Wade,* 71 Cal.App.2d 646 [163 P.2d 59].) ▉ As for the claims by Daston and Hosney that neither actually signed the numerous vouchers received in evidence, it need not be shown that the defendant himself executed the false instrument if there was proof that he procured its execution or aided and abetted another in doing so. (*People* v. *Mauldin,* 181 Cal. App.2d 184 [5 Cal.Rptr. 243] ; Pen. Code, § 31.) ▉ From an overall standpoint, a recent case seems almost apposite : "A person obtaining goods through a forged sales slip and the use of a stolen credit card commits several crimes, any one of which he can be charged with : theft of goods under section 484, violation of section 484a, or forgery under section 470." (*People* v. *Searcy,* 199 Cal.App.2d 740, 744 [18 Cal.Rptr. 779].)

There are four assignments of error. The first two relate only to Daston ; the third solely to Hosney ; the fourth concerns Buckley and Sciandra. ▉ As noted already, any claim of error must be accompanied by "such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result." (*People* v. *Watson, supra,* 46 Cal.2d 818, 837.)

▉ First, testimony was given by a police officer that he had found two pistols at Daston's home; earlier, under circumstances now to be narrated, the weapons were received in evidence despite timely objection. Relying on *People* v. *Lo Cigno,* 193 Cal.App.2d 360, 378-381 [14 Cal.Rptr. 354], Daston now argues that the reception of the two guns was wholly irrelevant and that their receipt as exhibits unfairly left the impression that the weapons had been unlawfully used in connection with the conspiracy (which was not the fact) and that he was a man of violence. Daston's possession of the two guns was injected into the trial during the officer's testimony, admitted only as to Buckley, pertaining to a state-

ment by Buckley that Daston had once come to his house and threatened him because he (Daston) was not getting his share of the purchases; as related by the officer, "he (Buckley) did not see any weapon when he (Daston) threatened him, but he had his hand in his coat pocket and indicated that he had a gun."

Daston does not question that the narrative of Buckley's admissions was relevant to the case against Buckley, the law relating to criminal conspiracy being what it is,[2] he does contend, however, that his possession of the two guns "did not tend to prove any material or relevant fact and should not have been admitted [citation]" (*People* v. *Lo Cigno, supra*, p. 380), and that this "misuse of evidence to the prejudice of the accused" warrants a reversal. In light of the whole record, we are of the opinion that the incident is disproportionate to the importance claimed for it by Daston. True, as observed in the *Lo Cigno* case, evidence of the existence of a material object usually has for its purpose the establishment of proof that it was a means of the commission of violent crime; likewise, such object may be exhibited to the jury or its existence proved whenever it has "such a relation to the fact in dispute as to afford reasonable grounds of belief respecting it, . . ." (Witkin, California Evidence, 349.) Daston argues that the use of violence in the crimes charged was not a "fact in dispute"; the Attorney General, however, points out that Buckley's credibility in the course of his admissions to the officer-witness was a matter of dispute and that it was inferential whether one of the guns found on the Daston premises was the one indicated in Daston's pocket—the inference is said to be an inference based upon an inference. (See *Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 698 [163 P.2d 470].) It may be questioned, therefore, whether the facts fall within those confronting the court in *Lo Cigno* where, it was determined, that "the evidence is not admissible for any purpose." (P. 381 of 193 Cal.App.2d.) Too, unlike *Lo Cigno*, the witness was one produced by the prosecution and testifying on direct

---

[2] "A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other. There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate." (Jackson, J., concurring in *Krulewitch* v. *United States*, 336 U.S. 440, 453-454 69 S.Ct. 716, 93 L.Ed. 790].)

examination; we do not, therefore, have the problem of a defendant or his witness being impeached on an immaterial or collateral matter as was the situation in *People* v. *Farnell,* 156 Cal.App.2d 393 [319 P.2d 749], and *People* v. *Burness,* 53 Cal.App.2d 214 [127 P.2d 623], both of which are cited in *Lo Cigno.* Furthermore, the record reveals that the witness was taken on cross-examination by Daston's counsel and admitted that it was not unlawful for an individual to have firearms in his home; Daston, in turn, took the stand and in the course of direct testimony explained that both guns were registered and that he had shot them with a friend and his wife. The trial of the instant case consumed some 18 days—the reporter's transcript exceeding 2,500 pages; even if the validity of Daston's claims be assumed, we are not persuaded that the incident in question, in view of the abundant evidence of his guilt, had such an impact on the jury that appellant was denied a fair trial within the meaning of the constitutional mandate. (*People* v. *Watson, supra.*)

The second assignment of error, likewise pertaining to Daston, challenges the consistency of the jury's verdict wherein he was convicted of conspiracy and acquitted of the substantive offense of forgery. The point is without merit. ██ "Normally a verdict of acquittal of one of several counts is not deemed an acquittal of any other count . . . It is only when the substantive offense charged is alleged to be the only overt act in furtherance of the conspiracy that an acquittal of the substantive offense operates as an acquittal of the conspiracy count based solely thereon. . . ." (*People* v. *Robinson,* 43 Cal. 2d 132, 138 [271 P.2d 865].) The instant indictment charged fourteen overt acts in furtherance of the conspiracy; Daston was alleged to have participated in five of such acts. The first two acts involving Daston referred to meetings with other defendants in Daston's home on January 11, 1960, in the forenoon of that day and at or about midnight thereof. Goldfarb, in his testimony, related conversations had on those occasions. At one time Daston stated that he would like to do the same thing as a certain other individual who reportedly obtained a credit card and had no intention of paying for the things so purchased; on another occasion during the course of these meetings, Daston was told that the group had some credit cards, that they were worth $200 each and Daston said "Okay." Still later, on the same date, Daston concurred in the suggestion that Buckley sign the name "Herman Wahl" to the cards. As stated earlier, Daston admittedly accompa-

nied other defendants in the group to the liquor store on Sunset Boulevard in the early morning hours of January 12 (overt act 4). ▮ Without discussion of other overt acts (involving Daston) alleged in the indictment, since proof of but one overt act will support a conviction (*People* v. *Garrison,* 80 Cal.App.2d 458 [181 P.2d 736]), it is clear that the present contention is lacking in substance. ▮ The overt act need not be, in and of itself, a criminal act (*People* v. *Gordon,* 71 Cal.App.2d 606 [163 P.2d 110]; all that is necessary is that it be done for the purpose of effecting the object of the unlawful agreement. (*People* v. *Cuda,* 178 Cal.App.2d 397 [3 Cal.Rptr. 86]; *People* v. *Ragone,* 84 Cal.App.2d 476 [191 P.2d 126].)

Next, it is contended by Hosney that evidence of another unlawful act committed by him was erroneously received. This evidence was as follows: Prior to October of 1959, John D. Anderson lost a Diner's Club card issued to him. On October 24, 1959, a purchase was made by Hosney at a Los Angeles clothing store; he offered in payment a Diner's Club card in the name of John D. Anderson and signed Anderson's name on the slip. While the salesman, who identified Hosney, was phoning the Diner's Club for verification, Hosney left the store. Stressing the fact that he signed none of the Wahl or Von Neumann vouchers, Hosney argues that the People may not show a defendant's prior criminal acts which have no tendency to prove some material fact relative to the crime charged. It was the People's theory, on the other hand, that Hosney was the supplier of the credit cards involved in the conspiracy. The evidence supports this theory, it appearing that Hosney secured credit cards belonging to others and thereafter utilized other people to procure merchandise therewith in return for money or merchandise. ▮ Although there is contrariety of opinion in this area of the law (see *Michelson* v. *United States,* 335 U.S. 469 [69 S.Ct. 213, 93 L.Ed. 168]), in California the test for admissibility of evidence of other offenses has been stated to be: " '[D]oes it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (*People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769].) In the light of the foregoing rule, the evidence was

clearly admissible; not only did it show that Hosney had past experience in the procuring of merchandise in the manner stated but it also demonstrated that he had a fraudulent intent in his use of the credit cards thus obtained. ▮ One thing more: complaint is made that the asserted error (in the admission of the above testimony) was compounded by the action of the deputy district attorney in asking that the Anderson credit slip be received with reference to the file in another criminal proceeding in which it was in evidence; upon appropriate motion, however, the court admonished the jury to disregard the reference to the other criminal action, and we must presume that such instruction was followed. (*People* v. *Sutic,* 41 Cal.2d 483, 494 [261 P.2d 241].)

Finally, as to Buckley and Sciandra we are referred to three instances of misconduct, said to be prejudicial, on the part of the prosecuting attorney. ▮ The first instance occurred during the cross-examination of Buckley. Having testified as to his prior employment by a milk company at the time of the commission of the offenses, he was then asked this question regarding the termination of his employment: ''Did you learn that the reason for your discharge was that there was a shortage in your funds of $208.45?'' Upon objection by defense counsel, further proceedings were had at the bench (outside the hearing of the jury); the prosecution offered to show at that time not only a motive on Buckley's part to become a member of the conspiracy, but also to rebut the inference that he was gainfully employed during the period mentioned in the indictment. The court sustained the objection to the question with the observation that the matter might not necessarily have been an offense; this, despite authority for the prosecution's theory that motive may be established by the need for monetary assistance: ''The evidence showing defendant's interest and participation in the affairs of the Terri Lee Enterprises was sufficient to establish a motive on his part to obtain immediate monetary assistance for a failing business in which he was interested. Whether his interest in the business was direct or indirect and of such an impelling force as to lead him to commit the offense of arson was a proper subject of inference from the evidence presented.'' (*People* v. *Miller,* 185 Cal.App.2d 59, 71 [8 Cal.Rptr. 91].) In view of the foregoing, the good faith of the prosecutor may not be validly questioned; and, of course, any possible prejudice otherwise was obviated by the court's action in sustain-

ing the objection. (*People* v. *Burwell,* 44 Cal.2d 16, 37 [279 P.2d 744].) The further point is made that the jury was not admonished to disregard the question—the court's ruling thereon having been made outside the jury's hearing. The fact, however, that the matter was not further pursued and the additional fact that an instruction was given wherein the jury was told that they must disregard any statement by counsel as evidence combine to negative the claim that prejudice resulted.

The next two instances of asserted misconduct relate to Sciandra. During his cross-examination he was asked if he had killed a poodle dog purchased by him from the Dastons, thereby implying that Sciandra was a man of cruel nature. Previously, on direct examination, Sciandra gave testimony that Daston had shown him two black poodles: "I fell in love with both of them but I could only purchase one." The trial court properly sustained the objection to the question, particularly since the prosecutor conceded that he did not then have evidence at hand to support the information that prompted the asking of the question. The further point is made, as in the case of the previous instance of misconduct (involving Buckley), that the jury was not admonished to disregard the question. Our discussion and determination of that claim are here controlling—certainly no prejudice appears. (*People* v. *Burwell, supra,* 44 Cal.2d 16, 37.)

The second instance of misconduct (involving Sciandra) likewise occurred during this cross-examination. He was asked whether he was employed during the month of January, 1960, when the offenses in question were committed; over objection, he stated that he was unemployed. The same question and answer (over objection) were asked and given with respect to 1959; as for 1958, he testified that he had some employment that year but did not file an income tax return for that period—no objection was interposed to the questions concerning 1958. Under the reasoning of *People* v. *Miller, supra,* 185 Cal.App.2d 59, 71, a pecuniary motive to commit the offenses charged was properly ascertainable from this line of interrogation.

Upon consideration of the entire record, we conclude that appellants had a fair and impartial trial, that no prejudicial error appears and that there has been no miscarriage of justice warranting a reversal.

The judgment and order as to each appellant are affirmed.

Wood, P. J., and Fourt, J., concurred.