[Crim. No. 4324. First Dist., Div. One. Apr. 6, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. WALLACE LEE JACK, JR., Defendant and Appellant.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Ian G. Allen, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Derald E. Granberg and John F. Kraetzer, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, P. J.—A jury found defendant guilty of forging a prescription for a dangerous drug. (Bus. & Prof. Code, § 4237.)[1] He appeals from the judgment of conviction.

On June 4, 1962, at about 11:45 a.m. Angelo J. Schenone, a pharmacist employed at the Four Corners Pharmacy in Concord, received a telephone call from a person identifying himself as Dr. Bagnall in Richmond. The caller said that he was telephoning in a prescription of 50 capsules of dexedrine for one Adrian Ryan.

Schenone wrote the prescription on a piece of paper captioned "Telephone Prescription" as the doctor was giving it

---

[1]Unless otherwise indicated, all code references hereafter are to the Business and Professions Code.

to him over the telephone. This paper, which was received in evidence without objection, thus contained the name and quantity of the medication, the directions for taking it, the doctor's name, address and telephone number, and the name and address of Adrian Ryan for whom the drug was prescribed. After the druggist received the telephone call, he was suspicious of the prescription and telephoned Dr. Bagnall to confirm it. The latter told Schenone that he had not telephoned the prescription to the pharmacy. Schenone thereupon telephoned the sheriff's office.

At about noon on the same day, defendant entered the pharmacy and browsed around. He at first declined Schenone's offer of assistance and went over to a watch display counter. When the druggist again approached him, defendant selected a watch and at the same time told Schenone that he was there to pick up a prescription for Adrian Ryan.

Although Schenone had already prepared the prescription, in order to delay defendant until a sheriff's officer arrived, he told defendant that it was not ready. He asked defendant for Ryan's street address and was given the same address received during the previous telephone call. He spent further time counting and recounting the capsules and finally brought the prescription and watch to defendant at the cash register.

At this time Officer Sang of the Contra Costa Sheriff's Office arrived and spoke to another employee in the store who in turn informed Schenone that "the gentleman from the Sheriff's office" was there. Thereupon, defendant, who had already taken out his wallet and was about to pay for the merchandise, stated that he did not have enough money and that he would have to get some from his wife who was in the car. Defendant then left the store followed by Officer Sang.

Defendant walked over to and entered an automobile parked in front of the drug store. There was no one else in the car. Sang then identified himself and requested defendant to return to the drug store for questioning. The two men, along with Schenone, went to a room behind the prescription department where Officer Sang asked defendant to explain the prescription and for an identification. Defendant produced his driver's license. Upon inquiry defendant denied making the previous telephone call. At one point during this conversation defendant asked Schenone if the latter had "to press this charge on me."

Sang then arrested defendant and took him to the county jail. During this trip defendant stated that he had been

previously convicted of a similar charge and was then on probation, and asked Sang not to call his probation officer.

The prosecution called Dr. Bagnall who testified that he had never telephoned the prescription in question nor authorized anyone to do so and that he had no patient by the name of Adrian Ryan. In addition the prosecution introduced evidence, which we need not set forth in detail, to the effect that on two prior occasions defendant had telephoned in to drug stores prescriptions for dangerous drugs which were purportedly from doctors for their alleged patients.

Defendant took the stand in his own behalf, denying that he telephoned in the prescription here involved and claiming that he intended to purchase only a watch and some razor blades. In substance he contended that it was Schenone and not he who mentioned the medicine and that he left because he thought Schenone was trying to force him to buy more than he ordered. According to defendant, he made the remarks about getting more money from his wife in the car only as an excuse to avoid sales pressure and get out of the store. Defendant, however, admitted his commission of similar acts on previous occasions, blaming them on domestic problems, work and scholastic pressure.

At the conclusion of the case in defense and outside the presence of the jury[2] defendant made a motion for a directed verdict of acquittal or in the alternative for a dismissal of the information on the ground that the evidence failed to establish a forgery of the prescription within the meaning of section 4237. After an extensive argument, the motion was denied.

Defendant contends on appeal (1) that the court erred in denying the above motion since a prescription cannot be forged within the meaning of section 4237 merely by making a telephone call; (2) that such a construction of the statute would amount to a denial of due process; (3) that the court committed prejudicial error in giving an instruction on defendant's flight; and (4) that the admission in evidence of certain incriminating statements of defendant was in violation of the exclusionary rule announced in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] and therefore requires a reversal of the judgment.

[2]The motion appears to have been made and argued before defendant rested as a matter of convenience, defendant's counsel stating that he planned to call an additional witness not then available. However, after the denial of the motion, the defense rested without introducing further evidence. The People introduced no evidence in rebuttal.

Section 4237 provides: "Every person who forges or increases the quantity of dangerous drugs in any prescription or who issues a prescription bearing a forged or fictitious signature for any dangerous drug as defined herein, or who obtains any dangerous drug by any forged, fictitious, or altered prescription, or who has in possession any dangerous drug secured by such forged, fictitious, or altered prescription, shall for the first offense be punished by a fine of not less than one hundred dollars ($100) and not more than five hundred dollars ($500), and for each subsequent offense shall be imprisoned in the county jail for not less than six months nor more than one year, or in the state prison for not more than six years."

The only provisions of the statute here involved are those prohibiting forgery of a prescription. While the information charged that defendant did "forge or increase the quantity of dangerous drugs in a prescription," the record makes clear[3] and the parties are in agreement that the case does not involve the increasing of the quantity in a prescription. Defendant's conviction must therefore be upheld, if at all, on the grounds that he forged a prescription. There is no issue as to the dangerous character of the drug.[4]

While cases and statutes throughout American jurisdictions abound in definitions (see 37 C.J.S. pp. 31-33), generally speaking forgery is the false making or material alteration of a writing with intent to defraud. (37 C.J.S. p. 31; 23 Am. Jur. pp. 676-677; 1 Witkin, Cal. Crimes, p. 445; 2 Wharton's Criminal Law and Procedure 396; Perkins on Criminal Law pp. 290-292.) ▮ In California, "forgery consists either in the false making or alteration of a document without authority or the uttering (making use) of such a document with the intent to defraud." (*People* v. *McKenna* (1938) 11 Cal.2d 327, 332 [79 P.2d 1065]; *People* v. *Searcy* (1962) 199 Cal. App.2d 740, 745 [18 Cal.Rptr. 779, 90 A.L.R.2d 814]; *People* v. *Hawkins* (1961) 196 Cal.App.2d 832, 837 [17 Cal.Rptr.

---

[3]The only instruction given the jury on the provisions of section 4237 was the following one requested by the People: "Every person who forges a prescription for any dangerous drug is guilty of a crime." The verdict of the jury reads: "We, the Jury in this case, find the defendant, Wallace Lee Jack guilty of violation of Section 4237 of the Business and Professions Code (Forging Prescription), as charged in the Information."

[4]The pharmacist Schenone testified that dexedrine, the chemical name of which is dextro-amphetamine, is a dangerous drug. Section 4211, subdivision (c) lists "Amphetamine . . . or compounds or mixtures thereof" as a dangerous drug.

66]; Pen. Code § 470.) In the case before us defendant contends, as we have already said, that the prescription could not be forged merely by talking on the telephone, thus arguing in effect that no writing existed which was the subject of the forgery. The People on the other hand maintain that the subject of the forgery was Schenone's written record of the prescription telephoned in, which record is within the meaning of section 4237.

■ Section 4215 which is found in article 8 (Dangerous Drugs) of chapter 9 (Pharmacy) of division II (Healing Arts) of the Business and Professions Code provides: " 'Prescription' means an order given individually for the person for whom prescribed, directly from the prescriber to the furnisher or indirectly by means of an order signed by the prescriber and shall bear the name and address of the prescriber, his license classification, the name and address of patient, name and quantity of drug or drugs prescribed; directions for use and the date of issue."[5]

The statute thus delineates two general types of orders constituting prescriptions: one directly from the prescriber to the furnisher; the other indirectly by means of an order signed by the prescriber. Experience tells us that the first category embraces, though perhaps not exclusively, situations where the doctor or other authorized prescriber telephones the pharmacist and the second category embraces the more frequent and common situations where the doctor writes out the prescription and hands it to the patient who takes it to the pharmacy to be filled. In the instant case there was no written prescription signed by the prescriber and the alleged prescription purported to be a direct order from the prescriber to the furnisher.

Section 4227 provides in pertinent part that "No person shall furnish any dangerous drug . . . except upon the prescription of a physician, dentist, chiropodist or veterinarian." Section 4331 provides in pertinent part that "All prescriptions filled shall be kept on file and open for inspection by duly constituted authorities for a period of at least two years," specifying punishment for wilful failure to do so.

■ It is clear then that while section 4215, defining the

---

[5]Section 4210 provides that the definitions of terms in article 8 "apply to this article only." However it is to be noted that the definition of "prescription" as found in section 4215 is essentially the same as that found in section 4036 which defines "prescription" for the entire chapter.

term prescription, does not expressly state that the direct order from the prescriber to the furnisher must be in writing, thus permitting in those cases an oral communication from the one to the other, it is within the legislative plan that such an order as, for example, a prescription telephoned to a pharmacist by a doctor be reduced to writing. If this were not done, the record keeping requirements of section 4331 could not be met. We think that the Legislature has provided for a comprehensive and uniform plan of control in respect to dangerous drugs. *All* filled prescriptions must be kept on file and open for inspection for the required period. This is effectuated by filing the usual written prescription signed by the doctor or other authorized prescriber or by filing a written record of a prescription orally transmitted. In the former instance, the order signed by the doctor and thus filed is the doctor's prescription; in the latter instance the written record of the order orally communicated by the doctor and thus filed, is in fact the doctor's prescription.

We find a helpful and persuasive analogue in *People* v. *Katz* (1962) 207 Cal.App.2d 739 [24 Cal.Rptr. 644] called to our attention by the Attorney General. Katz, a pharmacist, was charged with forging prescriptions for narcotics (percodan and codeine) in violation of Health and Safety Code section 11715.[6] He wrote up the prescriptions, giving the date, the name and address of the customer to whom the drug was sold and the name and license number of the doctor purportedly prescribing it. Katz claimed that the doctor in question had orally prescribed the drugs for his patient, the customer. The doctor denied that he did so or that he authorized anyone to do so. On appeal from a judgment of conviction Katz contended that the words ''Every person who forges or alters a prescription'' found in Health and Safety Code section 11715 (see fn. 6, *ante*) related to only written prescriptions signed by a physician, that ''prescription'' is what the physician issues, whether it be in writing or oral and that a record of an oral prescription, authorized or not, cannot be the subject of a forgery. The court in *Katz* re-

---

[6]Health and Safety Code section 11715 provides: ''Every person who forges or alters a prescription or who issues or utters an altered prescription, or who issues or utters a prescription bearing a forged or fictitious signature for any narcotic, or who obtains any narcotic by any forged, fictitious, or altered prescription, or who has in possession any narcotic secured by such forged, fictitious, or altered prescription,'' shall be punished by imprisonment as therein specified.

jected this contention stating: ''Although codeine and percodan may be prescribed orally, without the use of official triplicate blanks, it is mandatory that the pharmacist write up the prescription within 24 hours, containing all the data listed in section 11166.12. This is a procedural step which must be taken in order to give validity to the dispensing of the drug. The prescription written up by the pharmacist furnishes a record as to the means used by the physician to provide the drug for his patient and is a part of the overall system of control of the use of narcotics. It is in the public interest that the records be true and reliable with respect to all matters they must contain. As to those matters, false statements, made with knowledge of their falsity, imply an indisputable intention to deceive. . . . It is clear that the writing of a prescription by a pharmacist which is wholly false is a forgery.'' (207 Cal.App.2d at pp. 745-746, 747.)[7]

In our view the rationale of *Katz* is applicable to the case before us. Just as in that case the reduction to writing of the oral prescription for a narcotic was a necessary step to its valid dispensing, so in the instant one the reduction to writing of the oral prescription for a dangerous drug, implicit in the statutory requirement for the filing and inspection of a filled prescription, is a necessary step in the valid dispensing of the drug involved. Here, as in *Katz*, the prescription thus written up, kept on file and open for inspection furnishes, to paraphrase the language of *Katz*, a record as to the means used by the physician to provide the drug for his patient and is at the same time a part of the overall system of control designed for dangerous drugs. But more importantly, we think that the crucial determination made in *Katz* is that the oral or telephoned prescription thus written up *is* the prescription.

We are satisfied that in the case before us the telephoned prescription similarly written up *is* the prescription. The matter-of-fact reference made by both parties in their briefs to ''a piece of paper entitled 'Telephoned Prescription' ''

---

[7]Health and Safety Code section 11166.12 as in effect at the time of the acts committed in *People* v. *Katz, supra,* after stating that the provisions of that code with reference to the writing of narcotic prescriptions on official triplicate blanks and the filling thereof did not apply to percodan and certain other drugs, provided: ''Any of the combinations mentioned in the above subsections may be dispensed upon an oral prescription which must be reduced to writing within twenty-four (24) hours, by the pharmacist. The name and address of the person for whom prescribed and the name, address, telephone number and registered number of the prescriber must be recorded on the prescription.''

blurs and obscures the true character of this crucial piece of evidence. Neither of the parties has seen fit to have the exhibit transmitted to this court (Cal. Rules of Court, rule 10). We have done so ourselves (*ibid.*). The "paper" in question (People's Exhibit No. 1) is a printed form, approximately 4 inches by 5 inches, generally resembling prescription blanks commonly used by physicians. At the top appear in prominent capitals the words "TELEPHONED PRESCRIPTION." Underneath this caption are the following printed words with spaces for the appropriate information: "Name, Date, Address, Phoned By, Time, Deliver, Will Call, Original ℞ No., Do Not Refill, Refill —— Times." Thereafter is a substantial space obviously for the name and quantity of the medication or drug together with directions for its use. At the bottom of the document appear the following printed words with spaces for information: "Pharmacist, Dr's Phone, Doctor, Dr's Address, Reg. No." Without going into unnecessary details, the so-called telephoned prescription blank shows that it was completed by Schenone for "Adrian Ryan, 4785 Laura Dr., Concord"; that the name, quantity and directions for the use of the drug (dexedrine) was inserted; and that at the bottom of the document over the word "Doctor" was written "Wm. S. Bagnall" with the address "148 Broadway, Richmond." This exhibit is no mere "piece of paper" or casual notation of a telephone call. It appears to be a systematic and businesslike record of a purported prescription. Under the facts of this case, it *is* the purported prescription.

It is beyond argument that this is a false writing and that the falsity is in the writing itself. (See *People* v. *Bendit* (1896) 111 Cal. 274, 277 [43 P. 901, 52 Am.St.Rep. 186, 31 L.R.A. 831]; 2 Wharton, *op. cit.,* § 634, pp. 412-415; Perkins, *op. cit.,* pp. 296-297.) ■ Defendant procured the execution of the document (prescription) through the pharmacist Schenone just as effectively as if he had filled it out and signed the doctor's name himself. "[I]t need not be shown that the defendant himself executed the false instrument if there was proof that he procured its execution or aided and abetted another in doing so." (*People* v. *Buckley* (1962) 202 Cal.App.2d 142, 149 [20 Cal.Rptr. 659]; cf. Pen. Code, § 31; *People* v. *Weitz* (1954) 42 Cal.2d 338, 349-350 [267 P.2d 295]; *People* v. *Gayle* (1927) 202 Cal. 159, 163-164 [259 P. 750].) ■ "Where a person has caused a crime to be committed through the instrumentality of an innocent agent, such person is the principal." (*People* v. *Pounds* (1959)

168 Cal.App.2d 756, 758 [336 P.2d 219], citing *People* v. *Waxman* (1952) 114 Cal.App.2d 399, 408 [250 P.2d 339]; *People* v. *Keller* (1926) 79 Cal.App. 612, 617 [250 P. 585]; *People* v. *Monks* (1933) 133 Cal.App. 440, 447 [24 P.2d 508].) [8]

 While defendant did not in so many words request Schenone to make a false document, in his pose as a "physician" he ordered the preparation of the drug to be dispensed to his "patient" and must therefore be deemed to have called upon the pharmacist to do everything necessary for the proper and valid dispensing thereof. By telephoning to Schenone a false *oral* prescription, he caused the latter to make a false *written* one. He cannot now be heard to say that his scheme extended no farther than the telephone and that his message once communicated to the pharmacist had no subsequent causative influence. Defendant's past experience with the same artifice lends some support to the thesis that he fully knew what he was doing. His claim that he could commit no crime short of actually receiving the drug must fall before the above analysis of his acts. His ignorance of the law in this respect is no excuse (*People* v. *Burns* (1888) 75 Cal. 627, 630 [17 P. 646]; *People* v. *O'Brien* (1892) 96 Cal. 171, 176 [31 P. 45]; *People* v. *Reznick* (1946) 75 Cal. App.2d 832, 838 [171 P.2d 952]; *People* v. *McLaughlin* (1952) 111 Cal.App.2d 781, 789 [245 P.2d 1076]) and his evil design imparts to him knowledge of the legal consequences of his acts. (*People* v. *McLaughlin, supra.*)

Defendant protests that the pharmacist was neither innocent nor the defendant's agent. It is urged that Schenone had doubts about the genuineness of the telephoned information from the beginning and believed that the information was false. The record does not support this claim. It con-

---

[8]It is convenient to note at this point that in 1963, and after the commission of the offense in this case, legislation was enacted (Stats. 1963, ch. 1272, §§ 1, 2) adding section 377 to the Penal Code and section 4230.5 to the Business and Professions Code.

Penal Code section 377 provides: ''Every person who, in order to obtain for himself or another any drug that can be lawfully dispensed by a pharmacist only on prescription, falsely represents himself to be a physician or other person who can lawfully prescribe such drug, or falsely represents that he is acting on behalf of a person who can lawfully prescribe such drug, in a telephone communication with a pharmacist, is guilty of a misdemeanor.''

Business and Professions Code section 4230.5 provides: ''Every person who, in order to obtain for himself or another any dangerous drug, falsely represents himself to be a physician or other person who can lawfully prescribe such drug, or falsely represents that he is acting on behalf of a person who can lawfully prescribe such drug, in a telephone communication with a pharmacist, is guilty of a misdemeanor.''

458

tains no evidence that Schenone, upon receipt of the call, knew that the prescription was fictitious. *After* he received the telephone call, he telephoned Dr. Bagnall because "I was suspicious of the prescription, so I wanted to confirm it [the prescription] . . ." We cannot equate such suspicion with knowledge. The record does not indicate precisely when this suspicion was generated but it does show on the other hand that Schenone wrote up the prescription as if it were a genuine one.

The argument is also made that after Schenone verified his suspicions, all of his actions including the compounding and attempted sale of the prescribed drug were performed as an agent, not of defendant but of the sheriff. However the crime had already been committed when defendant's telephone prescription was reduced to writing. At this crucial time he was in the eyes of the law the agent of defendant.

Our conclusion that defendant violated section 4237 by forging a prescription[9] through an innocent agent makes it unnecessary to consider defendant's further contention that to construe the statute as providing that a prescription can be forged merely by making a telephone call offends against due process. We have not so construed the statute.

We turn to defendant's contention that the court committed prejudicial error in giving an instruction on flight. No claim is made that the instruction in question was an incorrect statement of law. The contention is without merit. The facts as summarized by us above are susceptible of the inference that defendant attempted to leave the pharmacy when he overheard the remark that the deputy sheriff had arrived, falsely stating as the reason for his departure that his wife was outside in his car and that he would have to get more money from her. The act of running away which constitutes flight in law and thus affords a basis for an inference of consciousness of guilt (see Pen. Code, § 1127c; *People* v. *Moore* (1963) 211 Cal.App.2d 585, 600 [27 Cal. Rptr. 526]; Witkin, Cal. Evidence pp. 273-274) requires

[9]It should be emphasized that while we have referred to the general law of forgery and to cases dealing with prosecutions under Penal Code section 470, we do not hold that the essential elements of that section and of Business and Professions Code section 4237 are identical and we should not be understood as concluding that defendant committed a forgery under section 470. That question is not before us. We point out, as the court did with respect to a similar statute in *People* v. *Katz*, *supra*, 207 Cal.App.2d 739, 746, that section 4237, unlike Penal Code section 470, does not require proof of an intent to defraud as an essential element of the crime of forging a prescription for a dangerous drug.

neither a physical act of running nor a far-away haven. ■ The evidence is sufficient to support the giving of the instruction. (See *People* v. *Murguia* (1936) 6 Cal.2d 190, 192 [57 P.2d 115].)

■ Finally we take up defendant's contention that the admission in evidence of incriminating statements made by him constitutes reversible error under the rule announced in *People* v. *Dorado, supra,* 62 Cal.2d 338. We first set forth the facts pertinent to defendant's claim.

Officer Sang testified on the prosecution's case in chief that after defendant left the drug store, Sang followed defendant to his car and requested him to return to the store so that he could talk to him. The two men, accompanied by Schenone, went into a back room of the pharmacy. Sang asked defendant to explain the prescription and to furnish an identification. Defendant thereupon produced a driver's license. At one point in the conversation defendant asked *Schenone*: "Do you have to press this charge on me?" *Sang* replied that the pharmacist had no choice since he had to protect his license. During this episode, Sang asked defendant if he had made the telephone call but defendant denied it. Sang testified that he then placed defendant under arrest and proceeded to take him to the county jail at Martinez.

■ The officer also testified to another conversation with defendant en route to the jail. "Well, I was talking to him about the prescription, asking him why he called it in, explaining to him the procedure that would happen, where we were going and what his procedure would be. He told me he knew, that he had been convicted of this charge before. He also told me that at the present time he was on— . . . He told me at the present time he was on probation. He told me who his probation officer was, requested that I not call his probation officer about this. I told him that I'd have to call his probation officer. That's about all that I remember."[10] On cross-examination Sang testified that at all times during his conversations with defendant both at the drug store and en route to jail, the latter denied that he had telephoned the drug store or had come there to pick up any kind of medicine.

The prosecution also introduced independent evidence of

_____

[10]Defendant's motion to strike that portion of the testimony referring to defendant's previous conviction of a similar charge was denied. No objection was interposed on the ground that defendant's statements were coerced or involuntary.

the commission by defendant of similar previous offenses in 1958 in pharmacies located in Santa Clara (involving sulfedexan) and in Palo Alto (involving dexedrine) and in addition thereto evidence of defendant's extrajudicial admissions relating to these two incidents. A captain of detectives for the City of Santa Clara testified to a conversation with defendant at the time of the Santa Clara incident during which defendant admitted purchasing the drug involved and ordering it by telephone using a fictitious doctor's name and also admitted that he had done the same thing before in Palo Alto. According to the witness, the incriminating statements were made after he had arrested defendant and during questioning both en route to and after arrival at the police station. A police officer formerly employed by the City of Palo Alto testified that in connection with the 1958 offense in that city, he took defendant to the police station where he interrogated him and obtained his signed statement. In this statement defendant not only admitted that he had telephoned a fictitious prescription on that date but also admitted that he had done the same thing on at least five previous occasions using various fictitious names of doctors and patients. Defendant's Palo Alto statement was thereupon received in evidence in the instant case and read to the jury.

Defendant now complains of the admission in evidence of (a) defendant's inquiry in the back room of the pharmacy as to whether Schenone had to press charges against him on the grounds that such statement was an implied admission; (b) defendant's statements made to Sang en route to jail; and (c) defendant's statements made to the Santa Clara and Palo Alto authorities in connection with the incidents there in 1958.

Following the decision of the Supreme Court of the United States in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the Supreme Court of California held in *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354, ''that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'',

Defendant's statement (question) in the back room of the pharmacy occurred while Sang's investigation was still a general inquiry into an unsolved crime and before it had focused on defendant as a particular subject. It was also made before defendant was arrested and in custody. At least two of the conditions of the *Dorado* rule did not obtain. This statement of defendant did not fall within the exclusionary rule and its admission in evidence was not error.

When defendant's statements were made en route to jail, the questioning was no longer investigatory but had begun to focus on defendant as a particular suspect. He was then under arrest, in custody and on his way to jail. Two conditions of the exclusionary rule are met. Indeed they are satisfied by the circumstance of the arrest itself. ''[T]he arrest encompasses two of the circumstances which produced the accusatory stages in the *Escobedo* and *Dorado* cases: (1) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, and (2) the suspect is in custody.'' (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) However we have some difficulty in determining whether the statements en route to jail were made while Sang ''had carried out a process of interrogations that lent itself to eliciting incriminating statements.'' (*People* v. *Dorado, supra,* 62 Cal.2d at p. 353.) The defendant's arrest does not of itself compel a conclusion that the third condition of the rule has been met. ''Although in most cases the process of interrogations following an arrest will so lend itself, it does not necessarily do so.'' (*People* v. *Stewart, supra,* at p. 578.) In order to determine whether this condition of the rule has been met, it is necessary to ''analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579.)

While interrogation of an arrestee in an automobile being driven by the arresting officer with no other persons present may not be conducted at the most suitable time or place to elicit incriminating statements, it is not without effectiveness, especially when employed by an experienced and skillful officer, as many reported decisions bear witness. We cannot say that the time and place of the interrogation

now under review requires us to exclude it as one contemplated by *Dorado*. The sparse record, however, throws little light on the length of time taken by the interrogation.[11] While in places the nature of the conversation seems innocuous ("I was . . . explaining to him the procedure that would happen, where we were going and what his procedure would be.") and defendant's statements concerning his previous offenses in some respects appear volunteered, nevertheless the definite impression is gained that the officer's objective ("Well, I was talking to him about the prescription. . . .") was to secure a confession of the recent offense which up to that time defendant had persistently denied committing. The seemingly casual nature of the conversation is consistent with the freindly approach technique of a skillful interrogator. (See *People* v. *Dorado, supra,* 62 Cal.2d at p. 345, fn. 2.) Although the record does not fully enlighten us, we feel that under all the circumstances it can be reasonably concluded that Sang's interrogation was designed to elicit incriminating statements. Finally, the record fails to show that at the pertinent time, Sang effectively informed defendant of his right to counsel or his absolute right to remain silent or that defendant waived these rights. ■ Contrary to the claim of the Attorney General, "We therefore cannot presume in the face of a silent record that the police informed defendant of his right to remain silent and of his right to counsel." (*People* v. *Stewart, supra,* 62 Cal.2d at p. 581.)

■ We conclude therefore with respect to the last mentioned statements that all of the conditions of the *Dorado* rule have been met and that the admission in evidence of said statements was error. The statements thus admitted were incriminating in character since they were not only susceptible of the inference of consciousness of guilt of the crime charged but also express admissions of similar offenses in the past. Nevertheless they did not constitute a confession of the crime charged so that the error in receiving them below was reversible per se. As we conclude *infra,* they were not prejudicial in the light of the entire record.

■ Finally we consider the admission of defendant's statements with respect to his commission of previous offenses in Santa Clara and Palo Alto as testified to by police officers of those communities. We are satisfied that each of these sets of statements meet all of the conditions of the *Dorado*

---

[11]Defendant's counsel did not cross-examine Sang as to the details of the conversation.

rule and that their admission in evidence in the instant case was error. In each instance defendant's statements made to those authorities constituted a *confession of the respective offense then and there involved.* However they were received in the instant case, as the court properly instructed the jury, not to prove those distinct offenses or continued criminality, but to show criminal intent, guilty knowledge, motive or common plan or scheme. (See *People* v. *Malloy* (1962) 199 Cal.App.2d 219, 230-231 [18 Cal.Rptr. 545] and authorities there collected.) They do *not* constitute a *confession of the crime charged in the instant case.* While we are satisfied that defendant's statements with respect to his prior offenses fall within the *Dorado* rule we find no language in *Dorado* or *Stewart* indicating that the characteristics of such statements as confessions in some way impregnate a subsequent unrelated case in which they are erroneously introduced so as to require automatic reversal.

However we have concluded that the error in admitting defendant's statements en route to jail and his statements as to earlier offenses was not prejudicial. Schenone testified that defendant told him he was at the drug store to pick up a prescription for Adrian Ryan (the fictitious name appearing on Exhibit 1). Although defendant denied all this, the evidence clearly establishes his flight from the store upon the arrival of the deputy sheriff and thus his consciousness of guilt. He himself admitted on the stand his prior offenses and acknowledged his use of dexedrine. His prior offenses in 1958 were incontrovertibly established by independent evidence apart from his confessions of them. After an examination of the entire cause, including the evidence, it does not appear to us to be reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. We cannot say that there has been a miscarriage of justice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Molinari, J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.